## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **VERTELLUS HOLDINGS LLC,** *et al.***,** | * |
| | * |
| **Plaintiffs,** | * |
| | * |
| **v.** | *  **Civil Case No. SAG-18-3298** |
| | * |
| **W.R. GRACE & CO.-CONN.,** | * |
| | * |
| **Defendant.** | * |
| | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

Vertellus Holdings LLC, Vertellus Integrated Pyridines LLC, Vertellus LLC, Vertellus Specialty Chemical (Nantong) Co., Ltd., and Vertellus Shanghai Trading Co., Ltd. (collectively "Vertellus"), a chemical manufacturer, filed this lawsuit against one of its suppliers, W.R. Grace & Co.-Conn. ("Grace"), alleging misappropriation of trade secrets, breach of contract, correction of inventorship for two patents, and various related state law claims.[1]  ECF 1.  Grace filed a counterclaim alleging bad faith assertion of trade secret misappropriation.  ECF 27.  Grace now moves for summary judgment on all counts.  ECF 150.  In the event that the Court does not grant its motion in its entirety, Grace also seeks a declaration that Vertellus is not entitled to certain damages.  *Id.*  Vertellus opposes Grace's motion and moves for partial summary judgment on its breach of contract and correction of inventorship claims and on Grace's counterclaim.  ECF 155.  Grace filed an opposition to Vertellus's cross motion, ECF 161, and Vertellus filed a reply, ECF 166.

---

[1] These claims include unfair competition, misappropriation of ideas, and unjust enrichment under New York common law.  ECF 1.  Vertellus also pleaded a separate claim for declaratory relief. *Id.*

Also pending are five motions that request the Court exclude testimony of three of Vertellus's witnesses, ECF 167 through 169, and two of Grace's witnesses, ECF 171 and 173. These motions are now fully briefed.  ECF 176, 177, 179, 180, 183, 189, 191, 193, 194, and 195. The Court has considered the parties' motions, oppositions, replies, and exhibits attached thereto. No hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2021).  For the reasons explained below, the Court will GRANT IN PART and DENY IN PART Grace's motion for summary judgment and GRANT IN PART and DENY IN PART Vertellus's cross-motion for summary judgment.  The Court will GRANT IN PART and DENY IN PART Grace's motions to exclude Dr. Colin McAteer's, Dr. Enrique Iglesia's, and Dr. Patrick Kennedy's testimony.  Finally, the Court will DENY Vertellus's motion to exclude Dr. Wolfgang Hölderich's testimony and GRANT Vertellus's motion to exclude Dr. Meyer's testimony.

## I.      FACTUAL BACKGROUND

Vertellus and Grace have a decades-long business relationship.  Vertellus manufactures chemical compounds called pyridines.  Grace produces catalysts, substances which speed up or otherwise optimize chemical reactions and are frequently used in pyridine manufacturing.  Grace has supplied Vertellus, and its predecessor company, Reilly Industries, Inc., with catalysts to use in its pyridine synthesis reactions.  Vertellus claims that certain information about the catalysts it purchased from Grace constitutes Vertellus's confidential and trade secret information.  Vertellus accuses Grace of using this alleged confidential and trade secret information to create and sell catalysts to other Grace customers—Vertellus's competitors—in violation of confidentiality agreements and trade secret protection laws.  Vertellus also contends that Grace wrongfully disclosed Vertellus's confidential and trade secret information in public patent filings and that

Vertellus's former researcher, Dr. Colin McAteer, should be credited as a co-inventor of Grace's patents.

### A. The Parties' Confidentiality Obligations

Throughout Vertellus and Grace's business relationship, the companies have taken measures to protect their proprietary information. The record contains three written confidentiality agreements. First, the parties entered into an initial "Non-Disclosure and Non-Use" agreement on May 14, 1997. ECF 151-3. The 1997 agreement was extended multiple times, but ultimately terminated on May 13, 2002. *Id.* Second, the parties entered into a "Confidentiality Agreement" on October 23, 2003. ECF 150-6. The 2003 agreement protected disclosures made between October 23, 2003, and October 22, 2006. *Id.* at 11–12. Third, another "Confidentiality Agreement" became effective on November 10, 2008. ECF 150-14. This 2008 agreement governed disclosures made until November 9, 2016. *Id.*

### B. The ZSM-5 Catalysts Grace Sold to Vertellus

Grace is in the business of producing catalysts, including catalysts used in pyridine production. Vertellus's business is pyridine production, which involves the use of catalysts. Though Grace and Vertellus have unique production and testing capabilities, they both have researchers concerned with the formulation or optimization of catalysts. *See, e.g.*, ECF 155-11 at 107–08 (discussing Grace's understanding of the "catalyst side" of pyridine and picoline production).

This dispute involves a particular type of catalyst called "Zeolite Socony Mobil 5" or "ZSM-5" catalysts.[2] ZSM-5 catalysts generally consist of ZSM-5 zeolites (a type of mineral) and

---

[2] ZSM-5 catalysts are also referred to as "MFI" catalysts. ECF 155 at 13 n.1; ECF 169-7 at 263:8–269:12. For consistency, the Court will use the term ZSM-5 catalyst, though at times, the materials cited use the term "MFI."

a binder such as alumina, silica, or clay.  Some ZSM-5 catalysts are "promoted" with metal ions.

ZSM-5 catalysts may also be "stabilized" with phosphorous.  Between 2008 and 2016, Vertellus

purchased three different ZSM-5 catalysts from Grace: (1) DAVICAT ® ZL ██████████ (2)

DAVICAT ® ZL ████████████████, and (3) DAVICAT ® ZL ███████████.[3]  As detailed

further below, Grace offered these materials to Vertellus in response to specific requests, primarily

from one of Vertellus's internal researchers, Dr. Colin McAteer.

**1.   ███████**

Dr. McAteer, a chemist who was employed by Vertellus for almost thirty years, led

Vertellus's efforts to optimize the use of catalysts in pyridine production.  ECF 155-13 ¶¶ 3–6;

ECF 155-15 ¶¶ 1–3.  As far back as March, 2003, Dr. McAteer had discussions with Grace about

the possibility of Grace and Vertellus developing a zinc-loaded, ██████████████████ ZSM-

5 catalyst.  ECF 151-4 at 3 (noting that the catalyst "would be developed between Reilly and

Grace").  Years later, in September, 2007, Dr. McAteer again met with Grace representatives and

discussed Vertellus's interest in a zinc-loaded, ████████████████ ZSM-5 catalyst.  ECF

151-9.  In an internal document, Grace noted after the meeting that it needed to "analyze the market

potential and estimate the cost" of fulfilling Vertellus's request.  *Id.* at 4.  Grace also noted it should

"investigate whether there are any other Davicat products that can be recommended."  *Id.*  In

contemporaneous internal emails, Grace further debated whether they could provide a sample

catalyst to Vertellus.  ECF 151-8.  One Grace official noted that Grace had a sample "on the shelf"

that "matches quite well what Vertellus discussed."  *Id.* at 3.  Neil Smith, one of Grace's business

---

[3] Vertellus also referred to these catalysts internally as ████████, and █████.  For consistency, the
Court will use the Davicat numbers, which were used in communications between the parties,
throughout this opinion to identify the catalysts.

directors, stated, "We don't want to make any special samples," but there was "no problem with sending samples of off-the shelf commercial products."  *Id.* at 1.

In early 2008, Grace agreed to provide Vertellus with a ███████████████ ZSM-5 catalyst sample.  ECF 155-13 at 7 (remarking on January 21, 2008, "Looks like Grace are now prepared to make us some ████████ MFI samples (after 5+ years of indecision on the subject!)").  In February, 2008, Grace sent Vertellus a ten-pound sample of a ZSM-5 catalyst that it referred to as "████████"  ECF 151-2 ¶ 6.

As requested by Dr. McAteer, ████████ is a ZSM-5 catalyst ████████████████ ████████████  ECF 151-2 ¶ 4.  Grace did not initially produce ████████ for use in pyridine manufacturing, but for use in a different kind of chemical reaction.  ECF 151-2 ¶ 4; ECF 151-6 at 5 (describing ████████ as ZSM-5 catalyst that was already in Grace's inventory in July, 2005); ECF 155-2 (noting ████████ was produced in a "pilot scale production" but "did not work as an ████████ ██████████████████████████").  However, as early as 2005, Grace had sent samples of ████████ ████ to other pyridine manufacturers.  Specifically, in May, 2005, ████████████████, a ████████ pyridine manufacturer inquired with Grace about whether Grace could provide a ████████ ZSM-5 catalyst ████████████████.  ECF 151-5 at 7.  Weeks later, Grace sent a five-kilogram sample to ████ ████ ECF 151-6 (noting the material was already in Grace's inventory and referred to as "████████ ██").  Grace also supplied samples of a ZSM-5 catalyst to ████████ and ████████████ ██ ████████ pyridine-manufacturers in 2007.  ECF 151-7; ECF 151-8; ECF 151-2 ¶¶ 7–8 (explaining that the ZSM-5 catalyst samples sent to ████████████, ████████████ and ████████ were all the same material that was "manufactured in a single batch" at one Grace facility).

In the fall of 2008, based on promising test results with the ████████ sample, Vertellus engaged in discussions with Grace to purchase enough of the catalyst to run a commercial trial of

the material that would be called "DAVICAT ZL ███."  ECF 156-2; ECF 155-22 at 1; *see also* ECF 151-2 ¶ 9 (stating the ██████ catalyst was renamed "█████" when sold to Vertellus).  In September, Dr. McAteer sent Grace a draft "specification" for the catalyst.  ECF 155-22 at 2.  In December, 2008, the parties met and finalized the specification for █████  ECF 156-2.  At the meeting, Vertellus's representative, Linda Hicks, asked if Grace would only sell █████ to Vertellus.  *Id.*  Grace's Ed Laughlin told her, "DAVICAT ® █████ is defined by its specifications and those are unique to Vertellus."  *Id.*  He further stated that Grace "would not sell 'DAVICAT ® ZL █████ to others."  *Id.*

Although Grace had assured Vertellus that it would not sell █████ to anyone else, Grace did attempt to market similar products to other potential customers.  In December, 2008, the same month that Vertellus placed its first large order of █████, Grace tried to sell other pyridine producers a ZSM-5 catalyst that "would have a different spec and name to that offered to Vertellus" but "would work equally well."  ECF 156-3 (stating that the ZSM-5 catalyst is "our [Grace's] catalyst" but that Grace "worked with VERTELLUS with it" and that Vertellus did not want Grace "using them as a sales aid to sell our catalysts to their competitors").  Initially, as reflected in a January, 2009 internal email, Grace planned "not [to] sell the EXACT same catalyst to anyone other than Vertellus."  ECF 156-11.  Instead, Grace would create special catalysts for each customer using "the same ZSM-5 technology" but with a "tailored" specification.  *Id.*  In May of 2010, however, Laughlin seemed to change course and stated that Grace would sell another pyridine manufacturer, █████, a product "identical to DAVICAT ZL █████" ECF 156-10.  Grace would change the name to "DAVICAT ZL █████" but it would "have the identical recipe, process, cost, packaging (EXCEPT the label), etc." as ███.  *Id.*

**2.** ███████

Dr. McAteer had hoped that ████ would serve as a "platform" catalyst to hold zinc. *E.g.*, ECF 151-8 at 3 (noting that Vertellus would "impregnat[e]" the sample catalyst with zinc in their lab "for bench/pilot purposes"). In 2009 and 2010, he and his team conducted experiments adding zinc oxide to ████. ECF 155-15 ¶ 6. After testing a range of different quantities, Dr. McAteer concluded that loading ████ with ███ by weight of zinc oxide was an ideal amount. *Id. ¶* 7; *see also* ECF 156-23 (acknowledging that "Vertellus research has determined that a ██ ZnO promoted DAVICAT ® ZL ███ will improve performance"). Dr. McAteer worked with Grace to develop this zinc-loaded catalyst. In November, 2010, Grace's Ed Laughlin described the goal of the project on an internal document: "Modify the standard DAVICAT ® ZL███ formulation to include ███ZnO . . . ." ECF 156-23. He also acknowledged that the "IP is held by Vertellus." *Id.* In December, 2010, Vertellus placed a large order from Grace for the new catalyst. ECF 155-13 at 9–11. This new product would be called "███████." *Id.* ¶ 13. Vertellus began using ████ ████ in its manufacturing operations in the Spring of 2011. *Id.* ¶ 11. In August, 2011, Dr. McAteer asked if Grace could test some samples of the ██████ that were used in one of Vertellus's facilities. ECF 157-5. Among other things, Dr. McAteer asked for Grace to test the acidity using Lewis to Bronsted ratios. *See id.* (requesting "acidity measurements (Brönsted acidity via ██████ ███████"). Dr. Dorai Ramprasad, a Grace employee, oversaw the testing Dr. McAteer requested. *Id.*

As mentioned in the previous section, Grace sold another company, ████, a ZSM-5 catalyst similar to ████ called ████ in 2010. A year later, ██████ began asking Grace for a better-performing catalyst. ECF 157-2 (explaining that if Grace could not provide a "higher-yield catalyst" to ████ ████ would seek out a new supplier). Grace apparently recognized that it could

not give ███ the ████████ catalyst that "was made under a secrecy agreement with Vertellus." *Id.* (stating that this determination was based on advice from an attorney). In response to ████'s request, Dr. Ramprasad ultimately decided to make a ZSM-5 catalyst with a different amount of zinc-oxide than ████████. ECF 155-5 (describing ████ project as "modify[ing] an existing recipe for a ██ ZnO loaded Davicat ████ catalyst and use loadings of ██ and ████ ZnO").

**3.   ████**

Dr. McAteer continued his research efforts to optimize Vertellus's use of catalysts in its manufacturing processes. He became interested in varying the level of ████ in the catalyst as well as the level of zinc oxide. ECF 155-15 ¶ 13. In October, 2012, Dr. McAteer asked Grace about potentially increasing the percentage of ████ in the catalyst. ECF 155-13 ¶ 21. These efforts eventually led to the creation of a new zinc-loaded catalyst called "████" which Grace produced and sold to Vertellus. *Id.*; ECF 151-2 ¶ 2. Vertellus was using ████ commercially by late 2015. *Id.*

**C.  Dr. Ramprasad's Patent Filings**

While working at Grace, Dr. Ramprasad filed for multiple patents relating to ZSM-5 catalyst production. On October 25, 2012, he confidentially filed a provisional patent application entitled "Process and Catalyst for the Production of Pyridine and Alkyl Derivatives Thereof." ECF 150-15. The patent application published on August 27, 2015, and the patent was granted on March 21, 2017, as U.S. Patent No. 9,598,366 ("the '366 patent"). *Id.* Dr. Ramprasad is listed as the inventor and Grace is its applicant and assignee. *Id.* Dr. Ramprasad was issued a second, related patent on November 27, 2018, U.S. Patent No. 10,137,439 ("the '439 patent"). ECF 150-16. Both patents concern Lewis-to-Bronsted acidity ratios in zinc-loaded ZSM-5 catalysts. ECF 150-15; ECF 150-16 (stating that "a zinc modified zeolite based catalyst having an L/B ratio

8

ranging from about 1.5 to about 4.0 exhibits a significant improvement in pyridine yield as compared to yields obtainable using a zeolite based catalyst containing no zinc").

### D. Erroneous Delivery and Subsequent Investigation

In January, 2015, Vertellus realized that Grace sent it a catalyst sample that did not include zinc, despite the fact that it had been purchasing only zinc-loaded catalysts from Grace for several years.  ECF 158-2.  Grace officials immediately recognized this error could lead to "serious exposure" and that they needed to develop a "damage control plan."  *Id.*  Indeed, soon after, Vertellus discovered that Grace was selling catalysts similar to ███ and ██████ to other pyridine manufacturers, which it believed was in violation of the parties' confidentiality agreements.  ECF 158-1.  Although the parties attempted to resolve their dispute and salvage the relationship, these efforts proved unsuccessful and Vertellus filed the instant lawsuit.

### E. Vertellus's Reduced Revenue

Between 2014 and 2016 the market price of pyridine dropped significantly.  In May, 2014 Vertellus's average sale price for pyridine was ███ per kilogram.  ECF 169-2 at 118.  Nineteen months later, the price was only ███ per kilogram.  *Id.* at 119.  As a result, Vertellus's revenue from pyridine sales also plummeted.  In 2016, Vertellus lost a significant amount of business from one of its main customers, ██████████.  Previously Vertellus had provided ██████ with one hundred percent of the pyridine it needed for its ██████ facility based on an agreement that was executed in 1997.  ECF 169-9.  When the agreement expired at the end of 2015, the parties negotiated a new agreement.  ECF 169-8.  However, under the new supply agreement, ██████ agreed to purchase a minimum of only ██████ percent of its pyridine requirements.  *Id.* at 7.  Vertellus alleges that this loss in revenue is attributable to Grace's alleged misconduct.

## II.     LEGAL STANDARDS

### A. Exclusion of Expert Testimony

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony.  A qualified expert may give testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In essence, the trial court must ensure the proposed expert testimony "both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).  In *Daubert*, the Supreme Court provides five nonexhaustive factors a court may weigh in making this assessment: (1) "whether a theory or technique . . . can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) "the known or potential rate of error," (4) "the existence and maintenance of standards controlling the technique's operation," and (5) whether the technique or theory has gained "general acceptance."  509 U.S. at 592–94; *Pugh v. Louisville Ladder, Inc.*, 361 F. App'x 448, 452 (4th Cir. 2010).  However, ultimately, the inquiry is "a flexible one" and relevant factors can vary with the needs of each case.  *Daubert*, 509 U.S. at 594.

For the proffered evidence to be sufficiently reliable it "must be derived using scientific or other valid methods" and not based on mere "belief or speculation."  *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 340 (D. Md. 2011) (first quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999); then quoting *Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 477 (4th Cir. 2005)).  The court's analysis focuses on experts' methods, not their conclusions, but an expert opinion that relies on "assumptions which are

speculative and not supported by the record," is inadmissible. *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). For the proffered opinion to be relevant, it "must be 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *Casey*, 823 F. Supp. 2d at 340 (quoting *Daubert*, 509 U.S. at 591). Expert testimony "is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." *Anderson v. Home Depot U.S.A., Inc.*, No. GJH-2615, 2017 WL 2189508, at *4 (D. Md. May 16, 2017) (quoting *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993)).

The proponent of the expert testimony bears the burden of establishing admissibility, or "coming forward with evidence from which the trial court could determine that the evidence is admissible under *Daubert*." *Anderson*, 2017 WL 2189508, at *3 (quoting *Main St. Am. Grp. v. Sears, Roebuck, & Co.*, No. CIV JFM-08-3292, 2010 WL 956178, at *3 (D. Md. Mar. 11, 2010)); *see also Casey*, 823 F. Supp. 2d at 340; *Daubert*, 509 U.S. at 592 n. 10 (explaining admissibility must be established by a "preponderance of proof").

In determining the admissibility of expert testimony, the court considers two "guiding, and sometimes competing, principles." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). On the one hand, Rule 702 was "intended to liberalize the introduction of relevant expert evidence," and the court need not ensure the expert's proposed testimony is "irrefutable or certainly correct." *Id.* (explaining that admissible expert testimony can still be vigorously tested before the jury by "cross-examination, presentation of contrary evidence, and careful instruction

on the burden of proof" (quoting *Daubert*, 509 U.S. at 596)).   On the other hand, "due to the difficulty of evaluating their testimony, expert witnesses have the potential to 'be both powerful and quite misleading.'"   *Id.* (quoting *Daubert*, 509 U.S. at 595).   The court must determine whether the disputed expert testimony "has greater potential to mislead than to enlighten."   *Id.*   If so, the testimony should be excluded.   *Id.*; *see also Casey*, 823 F. Supp. 2d at 340 (noting such testimony would be barred by Federal Rule of Evidence 403).

### B.  Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   The moving party bears the burden of showing that there is no genuine dispute of material fact.   *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)).   If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial.   *Id.*   The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial."   *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993)).   The mere existence of a "scintilla of evidence" in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor.   *Id.* at 348 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).   Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another."   *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## III.     ANALYSIS

The Court will first resolve the motions to exclude witness testimony before turning to the summary judgment motions.

### A.  Motions to Exclude Testimony

Four of the pending motions are to exclude testimony of identified expert witnesses Dr. Hölderich, Dr. Iglesia, Dr. Kennedy, and Dr. Meyer. Dr. Hölderich's and Dr. Iglesia's proffered testimony generally relate to Grace's potential liability, while Dr. Meyer's and Dr. Kennedy's proffered testimony concern Vertellus's potential damages. In addition, Grace has filed a motion to exclude testimony of Dr. McAteer. Dr. McAteer has not been designated as an expert witness by Vertellus. Grace argues that portions of Dr. McAteer's affidavits and deposition testimony, which Vertellus submitted in connection with the pending cross motions for summary judgment, contain expert opinions and should be excluded from the Court's consideration because Vertellus

has not identified him as an expert and complied with the disclosure requirements of Federal Rule

of Civil Procedure 26(a)(2). The Court will first discuss Dr. McAteer's proffered testimony and

then will address the other four *Daubert* motions.

### 1. Dr. McAteer

Federal Rule of Civil Procedure 26(a)(2) requires a party to disclose the identities of expert

witnesses who will testify at trial and, in most instances, to provide a written report detailing the

expert's opinions and qualifications. Fed. R. Civ. P. 26(a)(2)(B) (noting specific contents required

in an expert's report). Vertellus has asserted that Dr. McAteer will serve as a fact witness, not an

expert, and has not provided a Rule 26(a)(2)(B) report authored by Dr. McAteer. *See* ECF 167-2

(referring to Dr. McAteer multiple times as a "fact witness" in letter from Counsel to the Court).

Lay witnesses, unlike those qualified as experts under Federal Rule of Evidence 702, can only

offer opinion testimony if such testimony is "(a) rationally based on the witness's perception; (b)

helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c)

not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

Fed. R. Evid. 701. Generally, under Rule 701, a lay witness may not "express an opinion as to

matters which are beyond the realm of common experience and which require the special skill and

knowledge of an expert witness." *Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d

200, 203 (4th Cir. 2000) (quoting *Randolph v. Collectramatic, Inc.*, 590 F.2d 844, 846 (10th Cir.

1979)). However, Rule 701 "does not interdict all inference drawing by lay witness." *United

States v. Perkins*, 470 F.3d 150, 156 (4th Cir. 2006) (quoting *United States v. Santos*, 201 F.3d

953, 963 (7th Cir. 2000)). A lay witness may "offer an opinion on the basis of relevant historical

or narrative facts that the witness has perceived." *United States v. Chapman*, 209 F. App'x 253,

265 (4th Cir. 2006) (quoting *Certain Underwriters*, 232 F.3d at 203). Ultimately, the line between

lay and expert opinion testimony is "a fine one," and a district court must exercise discretion in making the determination. *Lord & Taylor, LLC v. White Flint, L.P.*, 849 F.3d 567, 575 (4th Cir. 2017) (quoting *United States v. Perkins*, 470 F.3d 150, 155 (4th Cir. 2006)). The Fourth Circuit has emphasized that "the key to Rule 701 lay opinion testimony is that it must arise from personal knowledge or firsthand perception of the witness." *Id.*

Affidavits submitted in support or opposition to summary judgment motions must "show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. Proc. 56(c)(4). If the "material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence," a party may object to its consideration at summary judgment. Fed. R. Civ. Proc. 56(c)(2); *see also Sanchez Carrera v. EMD Sales, Inc.*, 402 F. Supp. 3d 128, 140–41 (D. Md. 2019).

Grace now argues that certain statements provided to the Court in connection with the pending summary judgment motions contain Dr. McAteer's expert opinion testimony, and because Dr. McAteer would not be permitted to offer such testimony as a lay witness at trial, the Court should disregard it when considering the parties' summary judgment motions. Specifically, Grace has identified nine individual statements in Dr. McAteer's 2019 affidavit, Dr. McAteer's 2021 affidavit, and Dr. McAteer's deposition, that Grace asks the Court to disregard. *See* ECF 167-1 at 2–3. In response, Vertellus argues that Dr. McAteer's testimony is entirely based upon his personal knowledge, and even if certain statements "cross the 'fine line' to the expert opinion realm," they should not be excluded because Grace was given ample notice of Dr. McAteer's testimony. ECF 180 at 5. The disputed exhibits are discussed in turn below.

### a.  Exhibit 13 – 2019 Affidavit

Grace asks the Court to strike paragraphs 24 and 25 of Dr. McAteer's 2019 affidavit. Paragraph 24 restates relevant narrative facts that are within Dr. McAteer's personal knowledge, namely, the composition of catalysts Vertellus purchased from Grace.  ECF 155-13 ¶ 24.  It also lists catalyst information from the face of the '366 Patent.  *Id.*  Though somewhat technical in nature, this is factual testimony that does not require designation as an expert.  Paragraph 25 offers an opinion that based on the similarities noted in Paragraph 24, Grace would not have realized the utility of the catalyst outlined in the '366 patent without information provided by Vertellus.  *Id.* ¶ 25.  Although Dr. McAteer has personal knowledge of what information Grace provided Vertellus about the performance of catalysts in its pyridine manufacturing process, Dr. McAteer does not have personal knowledge about other possible sources of information Grace considered prior to filing for the '366 patent.  Therefore, this Court finds that Dr. McAteer does not have proper foundation for offering the opinion in Paragraph 25, whether as an expert or a lay witness. Paragraph 25 will be excluded from the Court's consideration.

### b.  Exhibit 15 and Exhibit 85 – 2021 Affidavit and Deposition Testimony

Next, Grace asks the Court to strike paragraphs 8, 9, 12, 17, 18, and 19 of Dr. McAteer's 2021 affidavit, along with nineteen lines of Dr. McAteer's deposition.  These statements provide a mixed assertion of facts (for example, "In October 2010, I disclosed these initial favorable results to Grace and gave Grace instructions to make the catalyst," and, "We tested ██████████ catalysts over long periods of time.") and opinions (for example, "I should have been named an inventor on the '366 patent." and "Grace knowingly tested these catalysts in such a way as to . . . incorrectly report a proven catalyst . . . .").  Some of Dr. McAteer's opinion statements approach the "fine line" between lay and expert opinion.  For example, in paragraph 18 of the 2021 affidavit,

16

Dr. McAteer asserts, "Each of the issued claims 1-8 [in the '366 patent] describes ███████

██. These claims are also written broadly enough to describe ████████" ECF 155-15 ¶ 18.  These

statements, though based on Dr. McAteer's personal knowledge and years of experience with the

ZSM-5 catalysts used by Vertellus, concern highly technical matters outside the realm of "common

experience."

      Still, this Court finds that even if some of Dr. McAteer's statements cross the line from lay

opinion to expert opinion, the appropriate remedy is not exclusion of his testimony.  Vertellus

argues that if Dr. McAteer were to serve as an expert witness, the issuance of a full expert report

would not be warranted under Federal Rule of Civil Procedure 26(a)(2) because he has not been

"retained or specially employed to provide expert testimony" and did not regularly give expert

testimony in the course of his employment with Vertellus.  *See* Fed. R. Civ. P. 26(a)(2)(B).  Instead,

Vertellus would only need to provide the more limited disclosure described in Rule 26(a)(2)(C),

which includes "a summary of the facts and opinions to which the witness is expected to testify."

Vertellus asserts that it complied with this disclosure requirement by providing Dr. McAteer's first

affidavit, Exhibit 13 or ECF 155-13, in 2019.  Grace does not dispute that Dr. McAteer would not

be required to provide a written report or that the 2019 affidavit contains an adequate summary of

Dr. McAteer's testimony.  Grace nevertheless protests the inclusion of Dr. McAteer's testimony

because "Vertellus did not designate him as an expert for purposes of this case."  ECF 195 at 6.

As further elucidated below, even if Vertellus failed to properly identify Dr. McAteer as an expert

witness in accordance with the Court's scheduling order, the testimony will be allowed since the

exclusion of this official designation is harmless.

      Under Federal Rule of Civil Procedure 37, "[i]f a party fails to provide information or

identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information

or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). To determine whether the failure was substantially justified or harmless, the court considers the following factors: "(1) the surprise to the party against whom the witness was to have testified; (2) the ability of the party to cure that surprise; (3) the extent to which allowing the testimony would disrupt the trial; (4) the explanation for the party's failure to name the witness before trial; and (5) the importance of the testimony." *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003) (quoting *Rambus, Inc. v. Infineon Techs. AG*, 145 F. Supp. 2d 721, 726 (E.D. Va. 2001)); *see also Kristensen ex rel. Kristensen v. Spotnitz*, No. 3:09-CV-00084, 2011 WL 5320686, at *2–3 (W.D. Va. June 3, 2011) (allowing two witnesses to testify as experts because the sponsoring party's failure to explicitly indicate they would do so prior to the established deadline was harmless).

In short, these factors weigh in favor of allowing Dr. McAteer's testimony. The opinions asserted in Dr. McAteer's affidavits and deposition testimony are not a surprise to Grace. Grace has had Dr McAteer's 2019 affidavit for over two years before the pending motions for summary judgment were filed. Though not identical, the subject matter of the opinions expressed in Dr. McAteer's 2021 affidavit are largely the same as those expressed in his 2019 affidavit. *Compare* ECF 155-13 ¶ 26 ("I continued to work with Grace for the next three years on a next generation catalyst that might also be ensnared by the patent application Grace had filed."); *and id.* ¶ 27 (referring to Vertellus's catalyst as its "patentable formulation"); *and id.* ¶ 25 (comparing the composition of "Vertellus's catalyst(s)" to those in the '366 patent); *with* ECF 155-15 ¶ 8 ("I regarded this catalyst . . . as my invention."); *and id.* ¶ 17 ("Each of the issued claims 1-8 describes ▮▮▮▮▮▮▮."). Grace also deposed Dr. McAteer in August of 2020 for eleven hours (longer than any other witness) on his technical knowledge and his interactions with Grace. Grace avers

that Vertellus's failure to officially name Dr. McAteer an expert witness has prejudiced Grace because "[h]ad Dr. McAteer been designated as an expert witness, Grace would thereafter have deposed him on any such proffered opinions prior to the expert discovery deadline." ECF 195 at 6. This argument is unconvincing since, as noted, Grace has had ample time to question Dr. McAteer about his technical expertise and opinions. Indeed, one of the alleged "opinions" Grace seeks to exclude was prompted by Grace's own counsel at his deposition. Moreover, there is no reason to believe Vertellus acted in bad faith to somehow conceal Dr. McAteer's anticipated testimony, and even Grace has acknowledged the importance of Dr. McAteer's testimony to the case. ECF 180-2 (noting that Dr. McAteer's testimony on "highly technical" issues "is the essence of Vertellus's claims"). Therefore, the Court will deny Grace's request to exclude portions of Exhibits 15 and 85.

### 2. Dr. Hölderich

Vertellus argues that Dr. Hölderich's proposed expert testimony is unreliable and should therefore be excluded. The alleged unreliability is not due to a lack of technical knowledge, but Dr. Hölderich's failure to independently review "core depositions" and "consider critical documents" in forming his opinions. ECF 189 at 2. This Court, however, is not persuaded that because Dr. Hölderich reviewed only "perhaps 150 documents" that counsel provided him, instead of the "tens of thousands" of documents produced in the case, his opinions are so unreliable that they would be unhelpful to the trier of fact. *See id.* at 2.

A proffered expert with sound technical knowledge may nonetheless be an unreliable witness if he offers an opinion based on speculative or unsupported assumptions. *See, e.g.*, *Tyger Const.*, 29 F.3d at 142–43 (holding a damages expert opinion inadmissible where his calculations were based on an undisputedly false premise); *Newman v. Hy-Way Heat Sys.*, 789 F.2d 269 (4th

Cir. 1986) (holding expert testimony was properly excluded where the witness's theory was inconsistent with all other witness testimony and not supported by any evidence in the case).  In the same vein, where an expert fails to account for critical undisputed facts, his opinions may also be deemed too unreliable to be helpful to a jury.  *See, e.g.*, *Bryte*, 429 F.3d at 476–77 (holding a fire inspector's expert opinion that an electric blanket caused a fire was unreliable where the inspector failed to examine or consider other "common sense" potential causes, including an electric lamp and open flame candle).

However, as the advisory committee has noted, "When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts," and a trial court should not "exclude an expert's testimony on the ground that the court believes one version of the facts and not the other."  Fed. R. Evid. 702, advisory committee's note to 2000 amendment.  The Fourth Circuit has emphasized that "'questions regarding the factual underpinnings of the [expert witness'] opinion affect the weight and credibility' of the witness' assessment, 'not its admissibility.'"  *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017) (quoting *Structural Polymer Grp. v. Zoltek Corp.*, 543 F.3d 987, 997 (8th Cir. 2008)); *Burns v. Anderson*, 123 F. App'x 543, 549 (4th Cir. 2004) (holding expert testimony was properly admitted even though the witness "failed to review certain documents which would purportedly influence" his opinion because such arguments "address the proper weight to afford [the expert's] testimony, not its admissibility").

Here, Dr. Hölderich's opinions are not wholly speculative or unsupported by the facts in this case.  Dr. Hölderich reviewed over one hundred documents produced in this case and interviewed Dr. Ramprasad to develop his understanding of the facts.  Vertellus does not argue that these documents are unreliable, fabricated, or irrelevant to the opinions proffered by Dr.

Hölderich.  Rather, Vertellus suggests that other documents and deposition testimony tend to contradict the materials that Dr. Hölderich relied upon.  Vertellus is free to raise these concerns through its cross examination and presentation of such allegedly contradictory evidence, assuming it is admissible.  Vertellus's motion to exclude Dr. Hölderich's testimony will be denied.

### 3.  Dr. Iglesia

Next, the Court addresses Grace's motion to exclude certain testimony of Dr. Iglesia, one of Vertellus's proffered expert witnesses.  Grace asks the Court to prohibit Dr. Iglesia from offering the following testimony at trial: (1) factual narrative testimony; (2) testimony regarding the parties' or individuals' knowledge, state of mind, and intent; (3) testimony about the credibility of other witness testimony; (4) opinions based solely on temporal sequence or proximity; (5) opinions concerning phosphorous stabilization; and (6) a hypothetical thought experiment concerning the invention of the '366 patent mentioned in his expert report.

First, as to narrative testimony, the Court recognizes that it is primarily the role of the jury to assemble the facts from the evidence and so "[a]n expert cannot 'be presented to the jury solely for the purpose of constructing a factual narrative.'"  *In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Prods. Liability Litig.*, MDL No. 2775, 2021 WL 781682, at *13 (D. Md. Mar. 1, 2021) (quoting *In re Fosamax Prods. Liability Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009)).  However, where a witness "relies on her expertise to explain the context in which various documents were created, to define specialized terminology appearing in the documents, or otherwise to draw inferences requiring specialized expertise" a factual narrative may be admissible.  *Id.*  Dr. Iglesia's report includes descriptions of his understanding of the chain of events which led to the development of various catalysts.  However, as Grace recognizes, his report also contains opinions about pertinent technical issues in the case.  *See* ECF 193 at 8 ("While

Grace contests many of Dr. Iglesia's opinions on these scientific matters, it does not object to their admissibility."). Although the Court agrees that Dr. Iglesia should not use his position as an expert witness simply, for instance, to reconstruct a timeline for the jury without providing technical insight or analysis, it is not clear in the reports what testimony Vertellus actually will seek to elicit from Dr. Iglesia at trial. Moreover, Vertellus does not rely on Dr. Iglesia's reports in its summary judgment motion or in responding to Grace's summary judgment motion. Therefore, the Court will not attempt to exclude certain portions of Dr. Iglesia's allegedly factual narrative testimony at this juncture. If necessary, Grace may raise this issue again at trial. *See Hip Implant Prod. Liability Litig.*, 2021 WL 781682, at *13; *In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liability Litig.*, MDL No. 3:11-MD-2244-K, 2014 WL 3557345, at *7–8 (N.D. Tex. July 18, 2014) (finding the admission of narrative testimony "is not properly the subject of this Court's gatekeeping function under *Daubert*" but should instead be considered at trial); *In re Yasmin and YAZ (Drospirenone) Mktg., Sales Practices & Prods. Liability Litig.*, No. 3:09-md-02100-DRH-PMF, 2011 WL 6302287, at *8 (S.D. Ill. Dec. 16, 2011).

Next, the Court agrees that some of Dr. Iglesia's assertions in his expert report concerning other individuals' states of mind are inadmissible. Opinions about another's knowledge, motive, or state of mind are generally unhelpful to the jury because jurors can draw these conclusions themselves. *E.g.*, *Hip Implant Prods. Liability Litig.*, 2021 781682, at *13 (excluding expert testimony that speculates about a company's state of mind); *Eghnayem v. Bos. Sci. Corp.*, 57 F. Supp. 3d 658, 670 (S.D. W. Va. 2014) ("Although an expert may testify about his or her review of internal corporate documents solely for the purpose of explaining the basis for his or her opinions . . . a party's knowledge, state of mind, or other matters related to corporate conduct . . . are not appropriate subjects of expert testimony . . . ."); *In re C.R. Bard, Inc.*, 948 F. Supp.2d 589,

607 (S.D. W. Va. 2013) (reasoning that such topics are "lay matters"). Although Dr. Iglesia may use his specialized knowledge to opine, for instance, on the technical implications of particular documents, he may not speculate as to the knowledge, state of mind, or intent of another person. Statements such as, "In my opinion Grace's knowledge and expertise in pyridine synthesis would have been insufficient to choose from the extensive 'shelf' provided by the prior art and to select those compositions that would improve pyridine yields," ECF 168-2 ¶ 125, are inadmissible.

Likewise, it is solely within the jury's purview to make credibility determinations about particular witnesses. *United States v. Allen*, 716 F.3d 98, 105–06 (4th Cir. 2013); *Nimely v. City of N. Y.*, 414 F.3d 381, 397 (2d Cir. 2005) (explaining that this "well-recognized principle of our trial system" holds true even when credibility evaluations "are rooted in scientific or technical expertise"). Although Dr. Iglesia may opine that he disagrees with another witness's testimony or may point out inconsistencies, he will not be permitted to generally comment on the candor or lack thereof of any particular witness. Again, because Vertellus does not seek to rely on any portion of Dr. Iglesia's reports with respect to the pending summary judgment motions, it is not necessary for the Court to identify particular statements in Dr. Iglesia's report that impermissibly speculate about a party's mental state or credibility. *Accord In re DePuy Orthopaedics*, 2014 WL 3557345, at *8 (finding objections based on assertions that a witness's testimony is overly speculative about another person's intent in some respects are better adjudicated at trial than in a *Daubert* motion). Rather, Vertellus shall conform its questioning of Dr. Iglesia to avoid eliciting such improper testimony and, should these issues nevertheless arise, Grace may raise an objection at trial.

Next, the Court addresses Grace's argument that Dr. Iglesia should be precluded from offering conclusions "based solely on temporal sequence or proximity." ECF 168-1 at 10. Notably, in mounting this objection, Grace fails to identify any particular opinion which is based

*solely* on temporal sequence or proximity.  Instead, Grace avers that Dr. Iglesia "relies heavily" (but not exclusively) on time sequencing to support "many of his opinions."  *Id.* at 10–11.  Grace then cites particular paragraphs where Dr. Iglesia states that a particular sequence of events supports his conclusions.  However, unlike in other cases cited by Grace, it is undisputed that Dr. Iglesia used his decades of experience and technical expertise to conduct other analyses, including "compar[ing] Vertellus's catalyst formulations to the pyridine catalyst formulations sold by Grace to Vertellus's competitors and assess[ing] the degree to which they are similar from a scientific perspective, and compar[ing] the technical properties and characteristics of pyridine catalysts described in the '366 patent to Vertellus's catalyst formulations."  ECF 168-2 ¶ 16.  As previously discussed, Dr. Iglesia should not be called upon to narrate all the facts of the case for the jury.  However, Dr. Iglesia's opinion that a particular version of events comports with his scientific opinions or "serves as a confirmation of [his] technical conclusions," *id.* ¶ 160, may be admissible, particularly if the facts are already properly before the jury.  Therefore, this Court will not preclude Dr. Iglesia from offering such opinions at this time.

The next issue is whether Dr. Iglesia may offer opinions on ██████████████████.  Grace argues that Dr. Iglesia's opinion that ████████████████ "was thought at the time to be essential to prevent zeolite degradation," *id.* ¶ 78, has no basis, primarily because Dr. Iglesia allegedly did not properly acknowledge the teachings of several prior art patents, including U.S. Patent No. 4,675,410.  This criticism, however, goes to the weight of Dr. Iglesia's testimony, not its admissibility.  There is no question that Dr. Iglesia, who holds a Ph.D. in chemical engineering from Stanford University with a specific focus on catalysis and chemical reaction engineering and has decades of research experience in both academic and corporate laboratories, has a reliable basis to opine on the use of ZSM-5 catalysts in pyridine synthesis reactions.  Additionally, Dr. Iglesia

addresses Grace's assertion about prior art patents including the '410 patent in his rebuttal report. ECF 168-3 ¶ 15.  He opines that despite general disclosures in the '410 patent about the use of ZSM-5 catalysts in pyridine reactions, the catalyst used by Vertellus had distinguishable features. *Id.*  Moreover, Dr. Iglesia reviewed other relevant patents and prior art literature in forming his opinions.  To the extent that Grace disagrees with Dr. Iglesia's conclusions, it may advocate its view to the jury by cross examining Dr. Iglesia and presenting its own evidence.  The Court will not preclude Dr. Iglesia from offering opinions on ███████████████████.

Finally, the Court addresses the hypothetical raised in Dr. Iglesia's report.  Unlike lay witnesses, expert witnesses may provide opinions based on hypothetical facts.  *Certain Underwriters*, 232 F.3d at 203.  Still, a hypothetical opinion must be sufficiently tied to the facts of the case to be helpful to the trier of fact.  *See Tyger Const. Co.*, 29 F.3d at 142 ("An expert's opinion should be excluded when it is based on assumptions which are speculative and not supported by the record.").  Grace argues that Dr. Iglesia's hypothetical is premised on facts that are not supported by the record: first, that Dr. Ramprasad was a "general practitioner with generic knowledge about catalytic processes," and, second, that Dr. Ramprasad and Grace did not "have access to reliable pyridine synthesis testing facilities or know much about how to acquire such capability."  ECF 168-2 ¶ 187.  Although it is unclear to the Court what qualifications or experiences a "general practitioner with generic knowledge" might have, Vertellus makes no attempt to tie this description to the facts of the case.  There is evidence that Dr. Ramprasad conducted a literature review and independent study of pyridine catalysis before engaging in his development efforts.  ECF 168-4 at 281–82; ECF 168.  Moreover, as to Grace's access to testing facilities, there is evidence that Dr. Ramprasad did have access to facilities to test catalysts for pyridine synthesis reactions through Grace's customer, ██████████  ECF 168-4 at 305–06; ECF

168-6 ¶ 162.  Vertellus does not dispute these facts or explain why Dr. Iglesia's assumptions to the contrary are otherwise not critical to his hypothetical opinion.  Vertellus maintains that Dr. Iglesia's hypothetical demonstrates that Grace could not have created the catalyst described in the '366 patents from the prior art without Vertellus's information.  But without an explanation of how Dr. Iglesia's assumptions are tied to evidence in this case, the hypothetical opinion cannot reliably illustrate the plausibility or implausibility of Grace's narrative.  The Court therefore will preclude Dr. Iglesia from testifying about the specific hypothetical described in his expert report.  However, Dr. Iglesia will not be prophylactically prevented from answering hypothetical questions at trial, so long as the questions are grounded in the facts of the case, within Dr. Iglesia's expertise, and relate to the opinions disclosed in his expert reports.

### 4.  Dr. Kennedy

The Court now addresses the proffered opinions of Vertellus's damages expert, Dr. Kennedy.  Dr. Kennedy offers five different damages theories and associated calculations.  In its *Daubert* motion, Grace seeks to exclude Dr. Kennedy's testimony on four of five of those theories: (1) past price erosion, (2) future price erosion, (3) lost profits on a pyridine supply agreement, (4) and Vertellus's research and development costs.  As explained below, the motion will be granted in part and denied in part.

### a.  Past Price Erosion

Vertellus contends that because Grace used its proprietary information to sell better-performing catalysts to other customers, these pyridine producers could, like Vertellus, save costs in the manufacturing process and charge lower prices.  To estimate lost profits due to this alleged price erosion, Dr. Kennedy estimated the market price of pyridine in a hypothetical world in which Vertellus realized cost savings from its proprietary catalysts, but other pyridine manufacturers did

not.  ECF 169-2 ¶ 96.  Dr. Kennedy then calculated the difference in profits Vertellus would have

gained in this hypothetical scenario compared to Vertellus's actual profits to determine the profits

lost due to past price erosion.  *Id.* ¶ 91.  Dr. Kennedy's calculations rely on estimating the costs

saved to pyridine manufacturers from using the disputed catalysts.  To determine the costs saved

by other manufacturers, Dr. Kennedy calculated the rate of cost savings Vertellus achieved and

used that rate to approximate the savings that other pyridine producers also realized.  *Id.* ¶ 98–99.

He conducted a regression analysis to isolate Vertellus's cost savings due to switching from its

previous catalyst called "████" to the ████ ZSM-5 catalyst, from switching from ████ to ████

█, and from switching from ████████ to ████ *Id.* ¶¶ 59–64.  He estimates the percent of cost

savings was ████████████ respectively.  *Id.* ¶ 64.  Grace argues that this theory is

unreliable because it is premised on two allegedly unsupported assumptions: (1) that ████ is an

appropriate benchmark for calculating incremental gains realized by other pyridine manufacturers

and (2) that other pyridine manufacturers experienced the same "cost savings" as Vertellus.

Using the theory described above, Dr. Kennedy's report calculates past price erosion

damages based on Grace's alleged improper use of both ████ and Vertellus's zinc-loaded catalysts

and separately calculates price erosion damages based only on the alleged misuse of the zinc-

loaded catalysts.  *See* ECF 169-2 at 74–75.  Because, as the court explains *infra*, Vertellus cannot

succeed on its claims premised on the alleged misuse of ████ Dr. Kennedy will not be permitted

to testify about damages stemming from those claims.  Grace's first objection—that ████ is not an

appropriate benchmark for calculating costs savings—is therefore immaterial.  Dr. Kennedy's

calculations regarding lost profits from zinc-loaded catalysts do not use ████ as a baseline, but

instead use ████ ECF 183 at 18.  It is undisputed that Grace sold ████████, and ████████

████ a catalyst essentially identical in composition to ████before providing them with zinc-

loaded catalysts that Vertellus alleges were derived from its proprietary information.[4]  ECF 169-1 at 6 (detailing sales in metric tons to each company of ███████████████catalysts). Therefore, the use of ████provides a reasonable baseline, and Grace does not argue otherwise. Similarly, Grace's second objection is focused on Dr. Kennedy's estimations for costs savings from adopting ████  In its reply memorandum, Grace recognizes that there is some evidence in the record that other pyridine manufacturers reported actual yield improvements similar to those realized by Vertellus after switching from ████ or ████ to one of Grace's zinc-loaded catalysts. ECF 194 at 8.  Grace explains that "those yield improvements . . . are irrelevant to the Motion" because "[t]he Motion relates to Dr. Kennedy's assumptions associated with a switch, for example from the catalysts used by ████ . . . to Grace's non-zinc loaded catalysts, *i.e.* ████ ████." *Id.*  Because Dr. Kennedy will only be permitted to testify about damages stemming from alleged misuse of the zinc-loaded catalysts, and not ████ Grace's second objection to Dr. Kennedy's past price erosion opinion is also irrelevant.[5]  Dr. Kennedy's past price erosion testimony will be allowed as to the zinc-loaded catalysts.

### b.  Future Price Erosion

In addition to estimating losses from past price erosion, Dr. Kennedy also opines that Vertellus will continue to suffer lost profits in the future due to Grace's alleged unlawful disclosure

---

[4] Grace also sold another manufacturer, ████a relatively small amount of the ████ catalyst it sold to ████ but had not previously provided ████ with ████ ECF 169-1 at 6 (showing Grace sold .14 metric tons of ████ to ████ and 109.25 metric tons to ████).  Grace, however, does not argue that this detail in any way invalidates Dr. Kennedy's calculations.

[5] In a footnote in its opening brief, Grace also avers that Vertellus could have done more to establish its claim that its zinc-promoted catalysts would have yielded the same efficiencies as ████ "by running tests using zinc loadings between ████," reflecting the actual amounts in the ████ catalysts.  This criticism, however, goes to the weight of Dr. Kennedy's testimony, not its admissibility.  *See Bresler*, 855 F.3d at 195–96.

and misuse of its trade secrets and confidential information.  ECF 169-2 ¶¶ 104–08.  Grace argues

that Dr. Kennedy's future price erosion calculations are unreliable because they are premised on

the allegedly faulty assumption that absent Grace's actions, other manufacturers would not have

discovered other better performing catalysts.  Like its objections to Dr. Kennedy's past price

erosion calculations, Grace's objection here concerns damages stemming from the switch to ███.

Again, Grace takes issue with assuming that without Grace's alleged misdeeds, pyridine producers

would have been stuck using ███ or another similarly performing catalyst.  ECF 194 at 20

(criticizing Dr. Kenney's assumption that "no Chinese pyridine manufacturer would have found a

more efficient catalyst than ███ through November 9, 2026").  Dr. Kennedy, however, will only

be permitted to testify about price erosion damages that stem from other pyridine manufacturers

switching from ██████ to one of Grace's zinc-loaded catalysts.  Grace does not argue that

assuming that pyridine producers would not develop a more efficient catalyst than ██████ or

its alleged derivatives is overly speculative or contradicted by the evidence.  The Court also finds

no basis to find Dr. Kennedy's assumptions with regard to future price erosion damages from the

disclosure and use of the zinc-loaded catalysts wholly unreliable.  Dr. Kennedy therefore will be

permitted to offer his opinion about future price erosion damages only with respect to the zinc-

loaded catalysts.

### c.  Lost Profits on a Pyridine Supply Agreement

In addition to lost profits based on price erosion, Vertellus contends that it lost profits on a

supply contract with a large customer, ██████████.  Up until the end of 2015, Vertellus

supplied ██████ with one hundred percent of its pyridine requirements at its ██████ facility.

When Vertellus and ██████ negotiated a new supply contract in 2016, ██████ would only

agree to guarantee it would purchase at least ██████ percent of its pyridine needs from Vertellus.

Dr. Kennedy opines that the reduced sales from ███████ were "due to competition with ██████,"
that was only possible because of Grace's alleged misuse of Vertellus's confidential and trade
secret information.  ECF 169-2 ¶ 109.  Grace argues that this opinion is inadmissible because
██████'s decision to reduce its business with Vertellus was not based on competition from
█████, but due to an unrelated change in ████████'s corporate policy.  Ultimately the Court agrees
with Vertellus that the reason ███████ changed its position is a factual dispute that cannot be
resolved through Grace's *Daubert* motion.

As the Court has explained in its discussion of Dr. Hölderich's proffered expert testimony,
the Court cannot exclude expert testimony simply because it "believes one version of the facts and
not the other."  Fed. R. Evid. 702, advisory committee's note to 2000 amendment; *Bresler*, 855
F.3d at 195.  A presentation prepared by Vertellus states, "Due to corporate policy changes, 100%
supply at ██████ is finished."  ECF 169-10 at 6.  When asked about this "policy change" at
deposition, one of Vertellus's former Vice Presidents, John Washuta, explained that ███████ had
told Vertellus that it was "not relying on single suppliers any more."  ECF 169-11 at 196–197.
This explanation, however, does not disprove Dr. Kennedy's assumption that increased
competition from ██████ played a role.  It is, indeed, consistent with this testimony to assume that
████████ decision to use Vertellus as a sole supplier was only prompted or feasible because of
the availability of a suitable alternative, such as ██████.  Vertellus also identifies other evidence to
support this conclusion, including an affidavit from another Vertellus Vice President, Bernie
Szalkwoki, stating that "[b]ased on its knowledge of ████████, the 2016 Supply Agreement, and
the pyridine market, Vertellus's sales team has concluded that ████████ decided to reduce its
volume commitment to Vertellus due to aggressive price competition from ██████."  ECF 169-10
¶¶ 11–12.  Additionally, Dr. Kennedy's rebuttal report points to other circumstantial evidence to

support his conclusion, including the correlation of ███████'s use of Grace's zinc-loaded catalysts and ███████'s decision to obtain a second pyridine supplier, and several unique circumstances that mitigated potential risks to ███████ from relying on a single supplier including that Vertellus supplied pyridine to ████████████████████████████████████████████ ████████████████████████████. ECF 169-13 ¶¶ 49–50.  This Court therefore concludes that Dr. Kennedy's opinion on lost profits from decreased sales to ███████ is sufficiently tied to the facts of the case and is admissible under Rule 702.

### d.  Research and Development Costs

Additionally, Vertellus seeks to recover expended research and development costs as part of its actual out-of-pocket losses it incurred "in reliance on Grace's commitments that it would not disclose Vertellus's confidential information."  ECF 169-2 ¶ 29.  Dr. Kennedy opines that Vertellus incurred ███████ developing the ██████████████ catalysts between 2008 and 2015.[6]  ECF 169-2 ¶ 50.  The estimation of research and development costs includes one aggregate amount per year.  *Id.* at 116.  It does not identify how much money was spent on the development of each particular catalyst.  *Id.*  Grace argues that Dr. Kennedy's opinion on research and development costs should be excluded on multiple grounds, including because the aggregate amounts are unhelpful or misleading if Grace is not found liable for misappropriating all of the catalysts.

Other Courts have cautioned that in quantifying damages in one lump sum for all claims, plaintiffs assume risk that the damages calculation could be excluded in its entirety if they are unsuccessful in proving all of their claims.  *See Keystone Transp. Sols., LLC v. Nw. Hardwoods,*

---

[6] Dr. Kennedy also asserts that this amount is recoverable as unjust enrichment damages because it can be used to quantify the costs of development that Grace avoided in misappropriating Vertellus's technology.

*Inc.*, No. 5:18-cv-00039, 2019 WL 1770162, at *3 (W.D. Va. Apr. 22, 2019) (holding that at trial the jury would be instructed to only consider the damages expert's opinion and testimony "if it finds that all information he relied on to make his calculation constitutes a trade secret"); *BladeRoom Grp. Ltd. v. Facebook, Inc.*, No. 5:15-cv-01370, 2018 WL 1611835, *6 (N.D. Cal. Apr. 3, 2018) (warning "if [plaintiff] fails to prove at trial any of the hypotheses upon which [the damages expert] relies . . . his expert testimony will be stricken as irrelevant"); *Steves and Sons, Inc. v. JELD-WEN, Inc.*, No. 3:16-cv-545, 2018 WL 2172502, at *12 (E.D. Va. May 10, 2018) (allowing damages expert testimony "[a]ssuming [claimant] can establish that all the information underlying [the expert opinion] is a trade secret and was misappropriated"); *02 Micro Intern. Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, (N.D. Cal. 2005) (holding damages expert testimony was "useless to the jury" because it included an estimation of the total worth of several trade secrets but the jury found that only some had been misappropriated); *see also Brightview Grp., LP v. Teeters*, No. SAG-19-2774, 2021 WL 2627960, at *4 (D. Md. Feb. 8, 2021) (noting that if at trial or summary judgment plaintiff failed to prove expert witness's critical underlying assumptions, the expert testimony would likely be excluded).

Here, Dr. Kennedy bases his opinion on the assumption that Grace is liable for all of Vertellus's claims.  ECF 169-2 ¶ 12–13.  However, as explained later in this opinion, Vertellus cannot succeed on its claims based on the ███ catalyst.  Vertellus asserts that even if Grace only misappropriated later generations of catalysts, because Vertellus's research and development is "cumulative, . . . Grace would have . . . wasted (from Vertellus's perspective) . . . the full scope of development."  ECF 183 at 33.  This conclusory assertion is unavailing.

Though it may be true that the development or optimization of any one catalyst is built on previous research, such expenses can only be considered "damages" if they were "rendered

useless" by Grace's alleged misconduct.  *See Summit Props. Intern., LLC v. Ladies Pro. Golf Ass'n*, No. 07 Civ. 10407(LBS), 2010 WL 4983179, at *6 (S.D.N.Y. Dec. 6, 2020) (explaining that "reliance damages are available only for efforts 'rendered useless'" (quoting *V.S. Intern, S.A. v. Boyden World Corp.*, 862 F. Supp 1188, 1198 (S.D.N.Y. 2010))); *see also Lieberman v. Templar Motor Co.*, 236 N.Y. 139, 149 (1923) (Cardozo, J.) (explaining that "damages include expenses reasonably made in part performance of the contract, to the extent that they are wasted if performance is abandoned").  Dr. Kennedy's report indicates that Vertellus realized significant efficiencies and cost savings when it switched from its previous catalyst to ██ ECF 169-2 ¶ 64 (reporting cost savings of ████).  It, therefore, cannot claim that it expended costs on the research and development of ███ to its detriment.[7]  Dr. Kennedy's opinion relies on the assumption that Vertellus proves all of its claims and provides no means of determining what amount of damages arises from each claim.  Because the Court has determined that Vertellus cannot succeed on its claims associated with ███ Dr. Kennedy's opinion on Vertellus's wasted research and development costs will be excluded.

### 5.  Dr. Meyer

Finally, the Court addresses Vertellus's motion to exclude a portion of Dr. Meyer's proffered expert opinion.  Dr. Meyer was retained by Vertellus to respond to Dr. Kennedy's expert report on economic damages.  ECF  173-11 ¶ 5.  Vertellus challenges the admissibility of one paragraph of the report which includes a "sensitivity analysis" intended to "illustrate how his damages calculations would change assuming different percentages of cost savings from switching

---

[7] It is also unclear that Vertellus expended these costs reasonably "in reliance on Grace's commitments that it would not disclose Vertellus's confidential information," ECF 169-2 ¶ 29, because, as discussed below, Vertellus shared information about ███ while no confidentiality agreement was in place.

from a catalyst with the same efficiency level as ████ to Davicat ® ZL ███████████.”  ECF 173-11 ¶ 116.  As discussed above, because Dr. Kennedy's opinion concerning Vertellus's alleged price erosion damages associated with ████ is excluded, Dr. Meyer's sensitivity analysis is irrelevant and will also be excluded.

### B.  Motions for Summary Judgment

Grace has moved for summary judgment on all counts of Vertellus's complaint.  Vertellus has moved for summary judgment on its breach of contract claim (Count V), correction of inventorship and related claims (Counts VI  through IX), and Grace's counterclaim for bad faith assertion of trade secret misappropriation.  The Court first addresses Vertellus's breach of contract claim and correction of inventorship claims.   The Court will then address Vertellus's misappropriation of trade secrets claim and the other related claims and counterclaim.  Finally, the Court will address Grace's contention that, even if Grace is liable, Vertellus cannot recover damages based on Grace's saved costs of development.

#### 1.  Breach of Contract (Count V)

Vertellus has accused Grace of breaching its confidentiality agreements with Vertellus in two ways: by disclosing the formulation and utility of the catalysts Grace sold to Vertellus (1) to other potential customers by selling the same or similar products and (2) to the public at large through patent filings.  ECF 1 ¶¶ X–X.  Under New York law,[8] a breach of contract claim requires (1) formation of an agreement, (2) performance by one party, (3) breach of the agreement by the other party, and (4) damages.  *Markov v. Katt*, 176 A.D.3d 401, 401–02 (2019); *Bartell v. Onbank,*

---

[8] The 2003 and 2008 Confidentiality agreements both contain express provisions which provide that the validity and interpretation of the agreements shall be governed by New York law.  ECF 150-6 ¶ 24; ECF 150-14 ¶ 24.   Both parties therefore suggest that New York law governs Vertellus's breach of contract claim.  *E.g.*, ECF 155 at 19; ECF 161 at 11 (suggesting Vertellus's claims fail under both New York and Maryland law).

*Onbank & Tr. Co.*, No. 95-CV-1807 (FJS), 1996 WL 421189, at *3 (N.D.N.Y. July 19, 1996). In its motion, Grace does not challenge that Vertellus performed under the agreements or suffered damages. The remaining elements of Vertellus's claim are discussed below.

### a. Formation of a Valid Agreement

The record contains three distinct written confidentiality agreements, which were executed in 1997, 2003, and 2008 respectively. ECF 151-3; ECF 150-6; ECF 150-14. Neither party disputes the validity of these agreements. The 2003 agreement covers disclosures made through October 22, 2006, and the 2008 agreement covers disclosures starting on November 11, 2008. Between October 22, 2006, and November 11, 2008, there is no written confidentiality agreement governing the parties' disclosures. Vertellus argues that, even where no written agreement was in place, the parties "always behaved with an expectation of confidentiality, whether under a confidentiality agreement, while negotiating a confidentiality agreement, by agreeing to operate under a prior confidentiality agreement, or otherwise." *Id.* at 26–27. This alleged "expectation," however, cannot form the basis of Vertellus's breach of contract claim.

To form a valid agreement, the parties must manifest their mutual assent to be bound to definite contract terms. *See, e.g.*, *Markov v. Katt*, 176 109 N.Y.S.3d 295, 296 (N.Y. App. Div. 1s 2019); *Stonehill Cap. Mgmt., LLC v. Bank of the W.*, 28 N.Y. 3d 439, 448 (2016) (explaining the "meeting of the minds" must be "sufficiently definite to assure that the parties are truly in agreement with respect to all material terms"); *Cochran v. Norkunas*, 398 Md. 1, 14 (2007) (noting that mutual assent includes both the "intent to be bound" and "definiteness of terms" (citing Joseph M. Perillo, *Corbin on Contracts* § 2.8 (Rev. ed. 1993)). In support of its claim that there was an unwritten, binding confidentiality agreement, Vertellus points to a general pattern of the parties holding each other's information in confidence. These general expectations do not amount to

specific contractual terms and cannot form the basis of a breach of contract claim.  Vertellus has

also averred, more specifically, that after the 2003 agreement disclosure period expired, the parties,

at some point, agreed to continue to be bound to the 2003 agreement.  The only evidence Vertellus

has produced that indicates the parties intended to be bound to an interim confidentiality agreement

before the 2008 agreement was executed is one email from a Grace employee, Raj Albal, sent on

April 25, 2008, that states "We do not have a new CDA with Vertellus.  Still we are working off

the old CDA."  ECF 155-10.

      That one email does not suffice to define the material terms of the agreement, for example,

for how long the agreement would be extended.  Additionally, this statement contradicts explicit

language in the 2003 agreement that states:

> This Agreement constitutes the entire understanding and agreement between the
> PARTIES with respect to the subject matter hereof and there are no
> representations, understandings, or agreements, oral or written which are not
> included herein.  This Agreement cannot be modified in any respect except by
> an instrument in writing executed by a duly authorized representative of the
> PARTY to be bound thereby.

ECF 150-6 ¶ 25.  Indeed, the parties did amend the agreement once in writing to extend the

disclosure period, as they had done multiple times with the 1997 agreement.  *Id.* at 10–11; ECF

151-3 at 5–7.  Moreover, even if the email from Mr. Albal was enough to show an intent to be

bound to the previous agreement, Vertellus gives no reasons why Mr. Albal would have the

authority to bind Grace to the contract.  In the absence of a properly executed writing extending

the 2003 agreement or other evidence of Grace's intent to be bound to specific contractual terms,

the Court finds that disclosures made after October 22, 2006, and before November 10, 2008, are

not governed by an enforceable agreement.

      The parties' communications regarding the catalysts at issue in this case largely occurred

between 2007 and 2015.  Because Vertellus has not identified any communications covered by the

1997 or 2003 agreements as the basis for its breach of contract claim, the Court focuses the subsequent analysis on the terms of the 2008 agreement.

### b.  Breach of the Agreement

To show that Grace breached the agreement, Vertellus must demonstrate, first, that Vertellus disclosed confidential information, as defined by the agreement, to Grace during the disclosure period and, second, that Vertellus improperly handled that confidential information. Vertellus asserts that both the formulations of the ██ catalyst and the zinc-loaded ██████ and ██ catalysts and the fact that they worked well in Vertellus's pyridine manufacturing process constitute its confidential information that it disclosed to Grace.  ECF 155 at 20.

### i.  ██ Catalyst Information

Prior to the inception of the 2008 confidentiality agreement, Vertellus had discussions with Grace about developing a new ZSM-5 catalyst.  ECF 151-9.  Indeed, Dr. McAteer had shared a proposed composition of the catalyst with Grace, and Grace had sent a sample of ██████ to Vertellus. ECF 151-2 ¶ 6.  Vertellus reported promising results with the sample and communicated its intent to make a large purchase.  ECF 155-22.  The Confidentiality Agreement exempts from the definition of confidential information that which is already known to the receiving party.  ECF 150-14 ¶ 7(c) (stating "INFORMATION which RECEIVING PARTY can show was in its possession at the time of disclosure" is not confidential information under the agreement). Therefore, for Grace to have breached the agreement based on information about the ██ catalyst, the information must be different what was already disclosed or known to Grace prior to the agreement.  Vertellus points to one communication which occurred after the November 8, 2008 inception of the disclosure period, an email from Grace's Ed Laughlin to other Grace employees sent on November 14, 2008, stating that "Vertellus[] reports good results with the Development

samples." ECF 155-23. There is no indication of when these "results" were disclosed to Grace. Other evidence suggests much of the discussions occurred prior to November 11. *See, e.g.*, ECF 155-16 (November 7, 2008 email from Ed Laughlin providing "an update" on the DAVICAT ██ Pyridine Catalyst, informing other Grace employees that Vertellus's testing of the product is halfway complete and "going well," and that "Yields are fine and the material is performing as well as the earlier sample," and that a final report was due at the end of the month).

Vertellus identifies other communications to show there was some contemporary understanding that the ██ catalyst information was to be held in confidence, but these statements do not indicate that any new information was shared after the inception of the agreement and are otherwise unhelpful in establishing a breach of the agreement. In an internal email sent on December 19, 2008, one of Grace's business directors explained that even though the ZSM-5 catalyst Vertellus was purchasing was "our [Grace's] catalyst," the fact that Vertellus was going to make a large commercial purchase was to be "treated with the highest confidence." ECF 156-3. The email provided other talking points to sell the ZSM-5 catalyst to other potential customers, but advised that because Vertellus "don't [sic] want us using them [sic] as a sales aid to sell our catalysts to their competitors," the fact that Vertellus had already purchased the product should not be disclosed. This email, however, does not indicate that that the composition or utility of the ██ catalyst was treated as confidential information. To the contrary, it indicates that Grace viewed the catalyst as its properly held intellectual property that it was free to market to other customers so long as it did not tout Vertellus's purchase. Vertellus also points out that Grace's Ed Laughlin told Vertellus's Linda Hicks at a November, 2008, meeting that Grace would not sell "DAVICAT ® ██" to others. ECF 156-2. But nothing suggests that Laughlin made such a promise because it was bound by the 2008 CDA. Instead, Laughlin's response seems to have been

an attempt to placate Hick's concerns and finalize the contract.  *Id.*  Indeed, according to the memorandum cited, Hicks asked Laughlin if Grace intended to sell the ███ catalyst to others.  If doing so would have violated the CDA, it is unclear why she would have posed the question. Laughlin's response, that "'DAVICAT ® ZL ███' is defined by its specifications and those are unique to Vertellus," *id.*, seemingly leaves open the possibility that Grace could sell a similar product with a different specification to another customer.

In sum, Vertellus has proffered no evidence that the composition and effectiveness of the ███ catalyst was disclosed to Grace during the disclosure period of any confidentiality agreement. Thus, alleged improper disclosure of information regarding the ███ catalyst cannot serve as the basis of Vertellus's breach of contract claim.[9]

---

[9] Even if Vertellus did disclose certain information about the ███ catalyst's use or composition to Grace during a valid disclosure period covered by a confidentiality agreement, it is still unlikely that its breach of contract claim would succeed.  As discussed below in subsection IV.B.3, the Court's analysis of Vertellus's misappropriation of trade secrets claims, the composition of ███ and its potential use in pyridine synthesis reactions were already known to Grace and would likely not qualify for protection as "confidential information" under the agreement.

### ii.  Zinc-Loaded Catalyst Information

Unlike the ██ catalyst, Vertellus's discussions with Grace about its zinc-loaded catalysts occurred within the disclosure period of the 2008 confidentiality agreement.[10]   On October 15, 2010, Dr. McAteer sent an email marked "CONFIDENTIAL" to Grace referencing a September, 2010, meeting at which Dr. McAteer told Grace that Vertellus intended to provide a "recipe/formulation" for a new "zinc-loaded" catalyst.   ECF 156-19.   Dr. McAteer further confirmed that "a ██████ [sic] zinc oxide loading appears to be working sufficiently well that [Vertellus] would like to expedite a development program aimed at introducing a Zn-MFI catalyst." *Id.*; *see also* ECF 156-23 ("Vertellus research has determined that a ██ ZnO promoted DAVICAT ® ██ will improve performance.").

Still, Grace contends that this information falls outside the scope of the agreement because the information is not within Vertellus's "Field."   The terms of the agreement limit a party's confidential information to that which "falls within, relates, or pertains to" the "FIELD" of the party.   ECF 150-14 ¶ 4.   Grace proffers that information regarding the catalysts are "uniquely within the GRACE FIELD" because the Grace Field includes the "composition, properties, and the use of . . . silica-alumina based catalysts."   ECF 151 at 26; ECF 150-14 ¶ 2.   Vertellus counters

---

[10] Grace identifies one communication, from years before Grace ever supplied Vertellus with the disputed zinc-loaded catalysts, which occurred during a period where no written non-disclosure agreement was in effect.  *See* ECF 151-4 (April, 2003 email from Dr. McAteer discussing the possibility of purchasing a "ZnO-loaded ██████, zeolite MFI composition" catalyst from Grace).  In the email sent to Grace's marketing manager, George Alsfeld, Dr. McAteer included a list of characteristics for the desired product, including "██████ w/w ZnO dispersed on the ████████ support."  *Id.*  This email appears to indicate that Dr. McAteer shared a general vision for a zinc-loaded ZSM-5 catalyst with Grace without the protections of a nondisclosure agreement.  However, Dr. McAteer did not share the specific makeup of what became DAVICAT ██████ (over five years later) or its utility, since this information was not known to Dr. McAteer at the time.  Thus, contrary to Grace's contentions, the singular 2003 email from Dr. McAteer does not make all information shared by Vertellus about the zinc-loaded catalysts exempt from the later 2008 CDA.

that the information is "squarely within the Vertellus 'Field'" because the use of the catalysts is part of "the process for the manufacture of pyridine bases and their derivatives."  ECF 155 at 24; ECF 150-13 ¶ 3.

However, even if catalyst composition is not strictly "within" Vertellus's field, it is still protected if it "relates, or pertains to" the Vertellus field.  The ordinary meaning of "related" is "connected in some way; having relationship to or with something else."  *Related*, Black's Law Dictionary (11th ed. 2019); *e.g.*, *Healthcare Grp. LP v. Ethicon Endo-Surgery, Inc.*, 587 F.3d 1375, 1378 (Fed. Cir. 2009) (recognizing that without some indication that the parties intended to use the phrase "related to" in a narrower sense, the court should adopt the "ordinarily broad understanding of the phrase"); *see also Morales v. Trans World Airlines Inc.*, 504 U.S. 374, 387 (1992) (finding the "ordinary meaning" of the words "relating to" "is a broad one").  Certainly, the composition and performance of certain catalysts in the pyridine manufacturing process is at least connected with "the process for the manufacture of pyridine bases."

Grace argues that if the Court adopts the ordinary meaning of "relates to" it would render the field distinctions meaningless because information exchanged between the parties would almost always relate to both fields.  ECF 161 at 14.   *See Nomura Home Equity Loan, Inc. v. Nomura Credit & Cap., Inc.*, 30 N.Y. 3d 572, 525 (2017) ("[A] contract must be construed in a manner which gives effect to each and every part, so as not to render any provision 'meaningless or without force or effect.'" (citation omitted)).  This Court disagrees.  Even if the fields overlap, their definitions still serve the purpose of limiting the agreement's protections to information of a particular subject matter.  Grace essentially asks the Court to amend the agreement's definition of "INFORMATION" to read information that "*exclusively* falls within, relates, or pertains to the FIELD of that PARTY."  The Court must, however, enforce the unambiguous plain meaning of

the definition as written. *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002) ("[I]f the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract . . . ."). Therefore, the Court finds that the composition and performance of catalysts purchased by Vertellus are at least related to Vertellus's field, and the information conveyed to Grace about the zinc-loaded catalysts is confidential information as defined in the 2008 agreement.

Although Grace's arguments that Vertellus never disclosed confidential information about the zinc-loaded catalysts under the agreement are meritless, this Court finds there is a material dispute of fact as to whether Grace breached the agreement by improperly disclosing the information to third parties.

First, Vertellus argues that contemporaneous documents show that once Grace understood, based on reports from Vertellus's testing, that loading the ██ catalyst with ██ of zinc would produce a greater yield, Grace used this information to derive other catalysts to sell to other pyridine manufacturers. Notably, the 2008 confidentiality agreement binds the parties to hold in confidence not only the other party's "confidential information" but also "derivative information," or technical information that is "derived from, or based upon" confidential information. ECF 150-14 ¶ 9. In a September, 2011 work request form, Dr. Ramprasad describes the project to develop a new catalyst for ██. ECF 155-5. In his description he states, "We need to modify an existing recipe for a ██ ZnO loaded Davicat ██ catalyst and use loadings of ██████ ZnO." *Id.* Vertellus contends that this statement shows Dr. Ramprasad relied on the Vertellus catalyst specification in deriving the formulation for the new catalyst.

Grace, however, counters that this document merely demonstrates that Grace was modifying the "recipe" it used to make the ██████ catalyst, and the recipe refers to "the process used by Grace to make catalysts" and not the ratios of raw materials. ECF 161-4 at 43:25–44:4.

42

Dr. Ramprasad testified at deposition that the recipe was Grace's proprietary information and not known to Vertellus. *Id.* at 43:19–22. He explained that although the ███ catalyst used ███ zinc oxide, as Dr. McAteer requested, "Grace used its own recipe," and was "doing something different" than what Dr. McAteer suggested. *Id.* at 43:19–22, 53:24–54:4; *see also* ECF 151-21 (2011 email explaining that to make ███ "Grace used their own recipe from ███ group . . . and supplied a ███ loaded catalyst which works well"). According to Dr. Ramprasad the catalyst sold to ███ was strictly based on his research proposal and did not rely on Vertellus's confidential information. *Id.* at 142:1–6. Vertellus argues that this explanation should not be believed because, it alleges, Dr. Ramprasad lacked the requisite knowledge to develop such a catalyst without reliance on disclosures from Vertellus. ECF 155 at 9–10; *see also* ECF 157-22 (admitting that "our [Dr. Ramprasad and his Grace colleagues'] process knowledge of pyridine is small"). Though Dr. Ramprasad's knowledge of catalysts may not have been as great as Dr. McAteer's, Dr. Ramprasad attests that he engaged in study and experimentation of the relevant subject matter in order to develop other catalysts. ECF 161-4 at 142:1–6 (explaining he followed his own research plan); ECF 161-7 (detailing testing and experimentation plan); ECF 168-4 at 281–82 (acknowledging that Dr. Ramprasad has claimed the inspiration for his work was a journal article he read). Whether Dr. Ramprasad could have and did develop the catalysts without relying on Vertellus's confidential information is ultimately a dispute of fact that should be reserved for trial.

Vertellus's claim that Grace disclosed the information in patent filings, however, reaches a different result. Dr. McAteer asserts that, "[e]verything about ███ was disclosed down to the smallest detail," and that the patent also was "written broadly enough to describe ███." ECF 155-15 ¶ 17. Dr. Ramprasad has testified to the opposite saying, "I will categorically state that ███ is not included in this patent," and that it was written such that it

would "not . . . include the Vertellus material."   ECF 161-4 at 35:10–14.   Dr. Ramprasad's

contention, however, is wholly premised on the fact that the patent does not disclose the ▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐ of Vertellus's catalysts.   *Id.* at 3:3–22.   In describing the catalyst,

the '366 patent provides a range for the zeolite and zinc content and a silica-alumina ratio, and it

is  undisputed  that  the  ▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐.   The catalyst in the patent also

includes  a  ▐▐▐▐▐▐  binder,  like  the  ▐▐▐▐▐▐  catalyst.   The patent lists an L/B ratio of  about

1.5 to 4.0, whereas  ▐▐▐▐▐▐  has an L/B ratio of  ▐▐▐▐▐.   Although Dr. Ramprasad testified at

his deposition that "▐▐▐▐▐▐▐▐," even Grace's expert, Dr. Hölderich, admits that the

difference ▐▐▐▐▐▐▐▐▐▐.   ECF 166-1 at 242:20–25.   Therefore, the Court finds there

is no dispute that the patent discloses Vertellus's confidential information.   The confidentiality

agreement exempts "independently developed" information from its definition of "confidential

information," only if the employees engaged in the independent development did not have access

to  the  other  party's  confidential  information.     ECF 150-14 ¶ 7(e).   It is undisputed that Dr.

Ramprasad had access to Vertellus's confidential information about its zinc-loaded catalysts

during the time he was also allegedly conducting his own research that led to his patent filings.

Thus, even if a factfinder determines that Dr. Ramprasad reproduced the information in the patents

wholly without the use of Vertellus's confidential information, Grace would still be in breach of

the agreement.

In sum, Vertellus's breach of contract claim cannot be premised on disclosures regarding

▐▐▐▐.   However, there is a material dispute of fact as to whether the parties' agreement was

breached when Vertellus created other catalysts based on ▐▐▐▐▐▐▐ and sold them to competitors.

Finally, the undisputed facts show that Grace breached the agreement by disclosing the makeup of

Vertellus's zinc-loaded catalysts in Grace's patent filings.  Summary judgment on Count V will therefore be granted in part and denied in part as to each party.

### 2.  Correction of Inventorship Claims (Counts VI-IX)

Next the Court addresses Vertellus's correction of inventorship claims.  Counts VI and VII seek to add Dr. McAteer as a co-inventor of the '366 and '439 patents obtained by Grace and Dr. Ramprasad.  Relatedly, Count VIII alleges that Grace was unjustly enriched by Dr. McAteer's contributions to the patent, and Count IX seeks a declaration that Vertellus should be assigned all patent applications Grace has filed that incorporate any of Vertellus's confidential information.

A joint inventor "must generally contribute to the conception of the invention."  *Stern v. Trs. of Columbia Univ. in City of N.Y.*, 434 F.3d 1375, 1378 (Fed. Cir. 2006) (explaining "[c]onception is the touchstone of inventorship" (quoting *Burroughs Welcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1227–28 (Fed. Cir. 1994))).  Conception is the "formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice."  *Id.* (quoting *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed. Cir. 1986)).  However, "[w]hen an invention is made jointly, the joint inventors need not contribute equally to its conception."  *In re VerHoef*, 888 F.3d 1362, 1366 (Fed. Cir. 2018).  To be named a joint inventor, a person must:

> (1) Contribute in some significant manner to the conception or reduction to practice of the inventions, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do more than merely explain to the real inventors well-known concepts and/or the current state of the art.

*Id.* (quoting *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 (Fed. Cir. 1998)).  A patent "carries a presumption of validity, 35 U.S.C. § 282," and so the party seeking to correct the patent, Vertellus,

bears the burden of showing that Dr. McAteer was an inventor "by clear and convincing evidence." *Stern*, 434 F.3d at 1377.

Vertellus primarily contends that Dr. McAteer significantly contributed as an inventor by devising and understanding the utility of using particular levels of zinc oxide in ZSM-5 catalysts used in pyridine production through the development process of ███████, and that without Dr. McAteer's input, Dr. Ramprasad would not have been able to derive the composition of the catalysts described in the patents. The material factual disputes that prevent the Court from granting summary judgment on all of Vertellus's breach of contract claim theories also prevent the Court from granting summary judgment with regard to its correction of inventorship and related claims. As discussed in the previous subsection, the parties dispute whether Dr. Ramprasad relied on information from Dr. McAteer in developing the zinc-loaded catalysts and whether he could have conceived the unique ideas discussed in the patents without Dr. McAteer's novel inputs. Grace asserts that regardless of those disputes, Dr. McAteer cannot be a joint inventor because there is no evidence that Dr. McAteer appreciated or contributed to the discovery "that a zinc-promoted ZSM-5 or ZSM-11 catalyst having L/B ratios of about 1.0 to about 4.0 results in improved pyridine yields," ECF 161 at 42. However, as Vertellus points out, there is evidence, beyond Dr. McAteer's own assertions, that he did appreciate the significance of the L/B ratios to catalyst yield, in particular the fact that he requested Dr. Ramprasad conduct L/B testing on Vertellus's catalysts. ECF 155-13 ¶¶ 8, 18–20; ECF 157-5. Therefore, the Court will deny summary judgment to both parties on Counts VI-IX.

### 3. Misappropriation of Trade Secrets (Counts I, III, and X)

Next the Court addresses Vertellus's misappropriation of trade secrets claims. Vertellus alleges misappropriation of trade secrets under the federal Defend Trade Secrets Act ("DTSA")

(Count I) and the Indiana and Maryland Uniform Trade Secrets Acts (Count X).  Vertellus also alleges misappropriation of trade secrets under New York common law (Count III).

### a.  Choice of Law

Grace argues that New York law applies to Vertellus's trade secret misappropriation claims and, therefore, summary judgment should be granted in Grace's favor on Vertellus's claims under the Indiana and Maryland Uniform Trade Secrets Acts.  ECF 150 at 21–22.  Vertellus does not disagree that New York law should govern, but maintains that if "for whatever reason" the Court deems New York law does not apply, then Vertellus should be able to bring its claims under Maryland law.  ECF 155 at 31–32.  Ultimately, the Court agrees with the parties that New York law governs Vertellus's trade secret claims.

Both the 2003 and 2008 confidentiality agreements provide choice of law clauses which state, "The validity and interpretation of this Agreement and the legal relations of the parties to it shall be governed by the internal substantive laws of the State of New York, U.S.A., exclusive of its conflict of law provisions."  ECF 150-6 ¶ 24; ECF 150-14 ¶ 24.  Grace argues that even though some of Vertellus's alleged trade secrets were disclosed outside of the disclosure periods specified in the agreements, the choice of law provisions should nonetheless apply because "neither termination nor cancellation [of a contract] affect those terms that relate to settlement of disputes or choice of law or forum selection clauses."  ECF 161 at 14 (quoting Corbin on Contracts § 67.2, at 12 (rev. ed. 2003)).  Vertellus posits that "New York law does not apply to the extent that tort claims are not 'related to the legal relations of the parties' to the 2008 Confidentiality Agreement." Though Vertellus avers that the term "legal relations of the parties" is ambiguous, ECF 155 at 32, it does not argue that the current dispute should be excluded from its definition.

The Fourth Circuit has explained, "dispute-resolution provisions . . . are enforceable beyond the expiration of the contract if they are otherwise applicable to the disputed issue and the parties have not agreed otherwise." *U.S. Smoke & Fire Curtain, LLC v. Bradley Lomas Electrolok, Ltd.*, 612 F. App'x 671, 672–73 (4th Cir. 2015) (citing *Litton Fin. Printing Div. v. NLRP*, 501 U.S. 190, 204 (1991) (finding several business tort claims "fall within the ambit of the broadly worded forum-selection clause"); *accord Young Women's Christian Ass'n of U.S., Nat'l Bd. v. HMC Ent.*, No. 91 Civ. 7943 (KMW), 1992 WL 279361, at * (S.D.N.Y. Sept. 25, 1992) (finding plaintiffs unfair competition, trademark infringement, and misappropriation claims arose from a production contract and forum selection clause therefore governed the dispute). In the preambles to the 2003 and 2008 agreements, the parties describe the impetus for forming the agreements, citing "the need to disclose information of a sensitive or confidential nature." ECF 150-6 at 1; ECF 150-14 at 1. Trade secrets are indeed "of a sensitive or confidential nature." Therefore, this Court finds that construing the "legal relations of the parties" to include trade secret rights is not an unreasonable reading of the agreements, and because neither party suggests the Court should rule otherwise, the Court will enforce the choice of law provisions and apply New York law to Vertellus's trade secret claims. Vertellus's alternative argument, that Indiana or Maryland law applies, will therefore be discarded and the Court will grant summary judgment in Grace's favor on Count X.

### b. Vertellus's Alleged Trade Secrets

To succeed on its misappropriation of trade secrets claims, Vertellus must first show that the information at issue qualifies for protection as a trade secret. *E.J. Brooks Co. v. Cambridge Sec. Seales*, 31 N.Y.3d 441, 452 (2018) (discussing New York common law claims); *Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 129 (D. Md. 2020) (discussing DTSA claims). Under the DTSA, "all forms and types of financial, business, scientific, technical, economic, or

engineering information," including tangible and intangible property, can potentially qualify for protection as a trade secret. 18 U.S.C. § 1839(3). Similarly, under New York common law, a trade secret can be "any formula, pattern, device or compilation of information which is used in one's business." *E.J. Brooks*, 31 N.Y.3d at 453. To be deemed a trade secret by the Court, a plaintiff must show both that (1) the information "derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information" and (2) the owner of the trade secret takes "reasonable measures to keep such information secret." 18 U.S.C. § 1839(3)(A)–(B); *accord E.J. Brooks*, 31 N.Y.3d at 453 (explaining that a trade secret must "give[] [the owner] an opportunity to obtain an advantage over competitors who do not know or use it" (quoting *Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 407 (1993))); *see also Medidata Sol., Inc. v. Veeva Sys., Inc.*, 17 Civ. 589 (LGS), 2021 WL 467110, at *2 (S.D.N.Y. Feb. 9, 2021) (noting that because the requirements of a trade secret claim under DTSA and New York law are similar, "courts often rely on cases discussing New York law to analyze DTSA claims").

In addition to establishing its materials are protectable trade secrets, Vertellus must show that Grace misappropriated them. Under the DTSA, misappropriation of a trade secret means the unconsented "disclosure or use" of the trade secret. 18 U.S.C. § 1839(5)(B). Similarly, misappropriation under New York law means "using . . . in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *E.J. Brooks*, 31 N.Y.3d at 442. Vertellus alleges that the makeup and utility of the ▮▮▮ catalyst and of the other zinc-loaded catalysts it purchased from Grace are its trade secrets and that Grace misappropriated those materials by improperly using them to sell catalysts to other customers and disclosing them without Vertellus's consent in patent filings.

49

i.   ██████ **Catalyst Information**

First, Vertellus contends that the specific makeup of the ████ catalyst is its trade secret. Grace, however, maintains that ████ was an off-the-shelf product already within Grace's possession. As a matter of law, "there can be no claim for appropriating what was already known." *Chemithon Corp. v. Procter & Gamble Co.*, 287 F. Supp. 291, 317–18 (D. Md. 1968) (denying trade secret claims where the ideas were "not new" and "already known" by the defendant), *aff'd*, 427 F.2d 893 (4th Cir. 1970); *accord* 18 U.S.C. § 1839(6)(B) (specifically exempting from DTSA liability materials acquired through "independent derivation, or any other lawful means of acquisition"); *Kewanee Oil Co. v Bicron Corp.*, 416 US. 470, 475–76 (1974) ([T]rade secret law, however, does not offer protection against discovery by fair and honest means, such as by independent invention . . . ."); *Speedry Chem. Prods., Inc. v. Carter's Ink Co.*, 306 F.2d 328, 334 (2d Cir. 1962) (denying existence of a trade secret where information was "the result of [defendant's] own research and experimentation"); *Miller v Owens-Ill., Inc.*, No. N 74-370, 1975 WL 21097, at *1 (D. Md. Feb. 11, 1975) (denying trade secret claim because "it is unassailable that no compensation is warranted where the recipient has prior knowledge of the facts before their disclosure in confidence") (cited in Unif. Trade Secrets Act prefatory note (Nat'l Conf. of Comm'rs. on Unif. State Laws 1985)).

Although Vertellus points to some internal Grace communications to make the origin of ████ or ██████ appear mysterious, ECF 155 at 13 ¶ 11, what these communications and other evidence presented by Grace undisputedly shows is that ██████ was independently developed by Grace, then repurposed and renamed ████ for use by Vertellus. ██████ was originally developed for use, not in pyridine production, but in another type of chemical reaction. ECF 155-2 (explaining that ██████ was an "██████████" that was made for a different customer in 2005).

The evidence also indicates that the original desired use for the product never reached commercial scale production. *E.g.*, ECF 155-22 (noting that the catalyst "did not work as an ███████████" and was "one time pilot scale production"); ECF 155-17 (explaining that ████ was originally produced in a "large quantity" at the "Technical Center," but had not been previously produced at Grace's Valleyfield commercial production facility and acknowledging that Grace would need to scale up production to meet Vertellus's needs). Regardless, these details do not cast doubt on the fact that the ZSM-5 catalyst sample material provided to Vertellus in 2008 was from the same drum of already produced material at Grace that was called ████. Grace already understood how to make the material, which would later be described as ███.[11] ECF 155-22 (2008 email confirming that the sample sent to Vertellus "did indeed come from a drum that is in the SMR Inventory at the Technical Center"); ECF 151-2 ¶ 7 (attesting that the sample sent to Vertellus "was a sample of Grace's preexisting ████ catalyst"); ECF 155-22 (explaining that the specification for DAVICAT ZL ████ was "[b]ased on earlier ████ specification"); ECF 156-13 (noting that ████ was "built using our █████████████knowhow and skill"). Therefore, because it was already known to Grace before it was used by Vertellus, the formulation of ████ cannot serve as the basis of Vertellus's trade secret claims.

---

[11] Vertellus attempts to dispute that ████ and ████ were the same material by pointing out that if ████ was an off-the-shelf product, that information was not communicated to Vertellus. ECF 155 at 24 (citing Dr. McAteer's email to his Vertellus colleagues sharing news that Grace was prepared to "make" catalysts, and not provide an already developed solution). But this information alone is unpersuasive when compared to the multiple accounts cited by Grace, which describe the products as the same thing. Moreover, Vertellus provides no explanation as to why Dr. McAteer would have been informed of the catalyst's origin and proffers no other indicia that his assumption was true. In contrast, Grace offers other testimony that Dr. McAteer should have known that Grace would try to offer an on-hand material. ECF 151-12 at 174:20–175:3 (Vertellus's expert testifying at deposition that "when [Dr. McAteer] did receive [the sample], it should have been clear to him that that material had already existed, because Grace typically will not make experimental materials, okay, for customers that are not already on the shelf").

Additionally, Vertellus asserts that the efficacy of ███ in pyridine synthesis reactions is Vertellus's trade secret that was confidentially disclosed to Grace. This claim is also unsupported by the evidence. Vertellus points out that before Vertellus's testing of ████, which later became ████, a Vertellus employee, Sudhakar Jale, described the catalyst as "probably obsolete." ECF 155-3. It is difficult to determine exactly what Jale meant by "probably obsolete" in his July, 2007 email since the record contains little other context to this statement.[12] What the record does demonstrate, however, is that, Grace had sent samples of ████ to several pyridine manufacturers in response to requests for ZSM-5 catalysts, including Vertellus. *See* ECF 151-6 (detailing decision to send ████ sample to ████ in 2005); ECF 151-7 (discussing plans to send a ZSM-5 sample from the ██████ to ████ and ██████ in 2007); ECF 151-2 ¶ 6 (discussing sending sample to Vertellus in 2008). Certainly, it appears that Vertellus's purchase of the catalyst encouraged Grace to market it to other customers. ECF 156-3 (noting the "tremendous success at Vertellus" with the catalyst as a motivation for "roll[ing] this out to others"); ECF 156-12 (considering whether to offer "our ZSM5 Catalyst once we have learned that it has performed technically well with Vertellus"). Grace used Vertellus's success (though not by name) as a selling point to market Grace's capabilities. ECF 156-13 (highlighting "key points to our pitch" including that Grace has "made a very good catalyst for one of the World's leading pyridine producers"). However, being encouraged by the success of a product with one customer, does not mean that

---

[12] The entire statement reads:

> The ZSM-5 David is talking about is ████. It is very similar to the ████ catalyst but without any ██████████. ████ is probably obsolete but exists in the TMMIS3 database. This is not just a ████ ZSM-5 but ████ like ████ catalyst. Wu-Cheng's group provided small quantity samples to this customer in the past.

ECF 155-3 at 1. As discussed, ████ was originally created for a different purpose but never reached commercial scale production for its original customer.

Grace would not have otherwise known it could market the product to another customer, absent such success.  In fact, Grace's previous distribution of samples of the same material to other pyridine manufacturers implies the opposite.

Not only did Grace already know that ████ or ████ could be used in pyridine manufacturing, it was also generally known in the industry that a catalyst with the same qualities as ████ could be used for this purpose.  "[I]nformation that is public knowledge or that is generally known in an industry cannot be a trade secret." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984); *accord* 18 U.S.C. § 1839(3)(B) (requiring a trade secret to not be "generally known" to others who can use it for economic gain).  Vertellus does not dispute that key properties of ████ are disclosed in public patents, specifically U.S. Patent 4,675,410.  ECF 151-1 ¶¶ 8–12; ECF 155 ¶ 23.  Some evidence even suggests that Dr. McAteer personally recognized the similarity between ████ and what was disclosed in the '410 and other patents.  *See* ECF 151-17 (reporting that Dr. McAteer believed use of ████ would "fall under" the '410 or another patent).

Vertellus argues instead that this general public knowledge is immaterial because Vertellus's valuable trade secret disclosure was that "this *specific* ZSM-5 catalyst . . . ha[s] advantages over every other catalyst in the pyridine manufacturing process."  ECF 155 at 31. Courts have recognized that "knowledge of the particular process, method or material which is most appropriate to achieve the desired result may itself be a trade secret."  *Bond v. PolyCycle, Inc.*, 127 Md. App. 365, 376 (1999) (quoting *Head Ski Co. v. Kam Ski Co.*, 158 F. Supp. 919, 923 (D. Md. 1958)).  Even if a technology is generally known, "the choice of a particular material" to be used in the technology could be a trade secret.  *Id.*  As an initial matter, it is unclear that Vertellus's decision to make a commercial purchase of ████ and reporting of "good results" in its testing of the material conveyed that ████ was better than *every other catalyst*.  Regardless, *Bond*

and *Head Ski* are inapposite here.  Unlike in those cases, where the defendants were copying technologies previously developed by the plaintiffs, here, as discussed, Grace had already independently developed the specific material and knew the steps required to do so.[13]

In sum, the makeup and utility of the ███ catalyst cannot form the basis of Vertellus's trade secret claims against Grace.  Grace already independently developed the catalyst, albeit for a different purpose, and knew that it could be used in pyridine synthesis reactions.  Although Grace did not appear to have commercial success with the product prior to its use by Vertellus, attributing Grace's later success with other customers to misappropriation of Vertellus's trade secret information, does not rise above mere speculation.

### ii.    Zinc-loaded Catalyst Information

Vertellus also asserts that the makeup and utility of its zinc-loaded ████████ and ████ catalysts are its trade secrets.  Grace does not dispute that the information about these catalyst formulations have independent commercial value or that Vertellus took reasonable steps to safeguard their secrecy.  Grace instead argues that it did not misappropriate these trade secrets because it never sold the precise catalyst formulations to other customers or otherwise improperly disclosed them to third parties.  This argument is unavailing.  A misappropriation can occur where a defendant uses the trade secret to create another material, so long as such use was not done with the trade secret owner's "express or implied consent."  *Hardwire, LLC v. Ebaugh*, No. JKB-20-0304, 2020 WL 5077469, at *3 (D. Md. Aug. 27, 2020); *see also Brightview Grp., LP v. Teeters*,

---

[13] Even Vertellus's VP Linda Hicks described ███ as "a standard material that is not considered IP, only our numbering nomenclature would be confidential."  ECF 151-16.  At her deposition, Hicks walked back this statement, explaining, "I was tempering my concerns until I had an opportunity to truly evaluate it."  ECF 159-8 at.  Although she testified that she did not want to "impulsively jump the gun at making an accusation," this did not stop her from voicing concerns about Vertellus's other, zinc-loaded "proprietary composite" she anticipated was wrongly handled by Grace.   ECF 151-16.

441 F. Supp. 3d 115, 136–37 (D. Md. 2020) (holding there was a likelihood that defendant was liable for misappropriation where defendant incorporated trade secret information into its own tools and products); *Mangren Rsch. and Dev. Corp. v. Nat'l Chem. Co., Inc.*, 87 F.3d 937, 944 (7th Cir. 1996) ("[I]f trade secret law were not flexible enough to encompass modified or even new products that are substantially derived from the trade secret of another, the protections that law provides would be hollow indeed."). Here, Vertellus accuses Grace of, among other things, using the ███████ catalyst formulation to create other, modified catalysts to sell to Vertellus's competitors. Such use was not consented to and could potentially violate Grace's obligations under the parties' confidentiality agreement. As identified in the Court's discussion of Vertellus's breach of contract claim, material factual disputes about to what extent, if any, Grace relied on the ███████ catalyst to develop other zinc-loaded catalysts and create patentable inventions make summary judgment on this claim inappropriate. Summary judgment will therefore be denied as to Count III, misappropriation of trade secrets under New York law. However, as discussed in the following subsection, Vertellus's DTSA claim faces additional legal scrutiny.

### c. The DTSA (Count I)

Grace also asserts that the Court should enter summary judgment in Grace's favor on Count I as to Grace's claims concerning zinc-promoted catalysts because the DTSA does not apply to use of information disclosed in patent applications that pre-date the DTSA. Courts have found that under the DTSA publication of a trade secret in a patent application eliminates its status as a trade secret, since secrecy is a necessary element of a trade secret. *Olaplex, Inc. v. L'Oreal USA, Inc.*, 2020-1382, 2021 WL 1811722, at *6 (Fed. Cir. May 6, 2021) (explaining that "[i]nformation in published patents or patent applications is readily ascertainable by proper means"); *Attia v. Google LLC*, 983 F.3d 420, 426 (9th Cir. 2020) ("[D]isclosure of a trade secret in a patent

application extinguishes the information's trade secret status."); *BondPro Corp. v. Siemens Power Generation, Inc.*, 463 F.3d 702, 706 (7th Cir. 2006) ("Publication in a patent destroys the trade secret . . . ."). In a recent opinion, the Ninth Circuit recognized, in accord with other courts who had already addressed the question, that a defendant may be liable under the DTSA for continued use of another's trade secret, even where the trade secret was initially misappropriated prior to DTSA's enactment. *Attia*, 983 F.3d at 425; *see also AlterG, Inc. v. Boost Treadmills LLC*, 388 F. Supp. 3d 1133, 1146 (N.D. Cal. 2019) ("[C]ourts have generally held that the continued use of a trade secret after the effective date of the DTSA is actionable, even if the secret was initially disclosed prior to May 11, 2016); *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 382 (S.D.N.Y. 2020) (allowing DTSA claim to proceed on allegations that misappropriation continued after DTSA's enactment). However, the court also reasoned that because publication in a patent destroys the trade secret, "disclosure of a trade secret prior to DTSA's enactment does not preclude a misappropriation claim arising after enactment, [only] to the extent that the pre-enactment disclosure was not a patent publication." *Id.* at 426; *see also Avago Techs. U.S. Inc. v. Nanoprecision Prods., Inc.*, No. 16-cv-03737-JCS, 2017 WL 412524, at * (N.D. Cal. Jan. 31, 2017) (holding trade secret claims were extinguished by patent disclosures, despite continuing misuse). Although the Fourth Circuit has not ruled on this issue, this Court finds the Ninth Circuit's opinion persuasive. As the Ninth Circuit reasoned, "the plain text of DTSA requires the existence of a trade secret to establish a claim." *Attia*, 983 F.3d at 426 (citing 18 U.S.C. § 1836(b)(1)). Where a trade secret is completely destroyed by its public disclosure, there can be no continued misappropriation.

Here, Vertellus has argued that the '366 patent discloses "[e]verything about ███████ ███ . . . down to the smallest detail," and that the patent also was "written broadly enough to

describe ██████.”  ECF 155-15 ¶ 17.  The '366 patent application was published on August

27, 2015, prior to DTSA's 2016 effective date.  Although Vertellus points out that additional patent

applications were filed related to its trade secrets, this fact is immaterial because Vertellus does

not argue that these later patents disclosed additional trade secret information that was not included

in the previous patent.  Therefore, this Court finds that Vertellus's trade secret claims based on

their zinc-loaded catalyst formulations are not cognizable under the DTSA.[14]  Additionally, as

discussed above, because the ██████ catalyst-related alleged trade secret information was already

known to Grace, it also cannot form the basis of its DTSA claim.  Therefore, the Court will grant

summary judgment in favor of Grace on Vertellus's DTSA claim.[15]

### 4.  Unfair Competition (Count II)

The Court next addresses Vertellus's Unfair Competition Claim (Count II).  Under New

York law, unfair competition includes the "misapproprat[ion] [of] a commercial advantage

belonging exclusively to [the plaintiff] by exploitation of proprietary information and/or trade

secrets."  *Cold Spring Harbor Constr., Inc. v. Cold Spring Builders, Inc.*, 5 N.Y.S.3d 327, at *3

(Sup. Ct. 2014) (table decision); *Eagle Comtronics, Inc. v. Pico Prods. Inc.*, 256 A.D.2d 1202,

1203 (N.Y. Sup. 1998) ("[T]he gravamen of a claim of unfair competition is the bad faith

---

[14] Vertellus has consistently argued that the information about its ██████ and ███ catalysts disclosed in the '366 patent, formed the basis of Grace's development of other catalysts.  To the extent that Vertellus claims that its trade secret information regarding its zinc-loaded catalysts extends beyond what was disclosed in the '366 patent, it has not stated this claim with any specificity, and thus summary judgment for Grace is warranted.  *See, e.g.*, *Medidata*, 2021 WL 467110, at *3 ("If plaintiff's description of the trade secret is so 'vague and ambiguous' that no reasonable juror could possibly determine whether one of the elements of the cause of action is satisfied, a defendant should be granted summary judgment.").

[15] Because the Court will grant summary judgment in Grace's favor on Vertellus's DTSA and Maryland or Indiana Uniform Trade Secret Act ("UTSA") claims, it will not address the parties' arguments regarding whether Grace's alleged misappropriations were willful and malicious warranting additional damages or attorneys' fees under the DTSA or UTSA.

misappropriation of a commercial advantage belonging to another . . . by exploitation of proprietary information or trade secrets."); *see also Roche Diagnostics GMbH v. Enzo Biochem, Inc.*, 992 F. Supp. 2d 213, 222–23 (S.D.N.Y. 2013) (explaining this theory is based on the principle that "one may not misappropriate the results of the skill, expenditures[,], and labors of a competitor"). Grace argues that Vertellus cannot succeed on its unfair competition claim because Vertellus cannot prove that Grace misappropriated any of its trade secrets. ECF 150-1 at 25. However, as previously discussed, the Court has determined that Vertellus has proffered enough evidence to create a material dispute of fact as to whether Grace misappropriated its trade secrets related to its zinc-loaded catalysts. Therefore, Grace's motion for summary judgment will be denied as to Count II with respect to the claims concerning zinc-loaded catalysts, and granted as to its claims about ██████.

### 5. Misappropriation of Ideas (Count IV)

Finally, the Court addresses Vertellus's final claim for misappropriation of ideas. Under New York law, to succeed on a misappropriation of ideas claim, Vertellus must show: "(1) a legal relationship between the parties in the form of a fiduciary relationship, an express or implied-in-fact-contract, or quasi-contract, and (2) a novel and concrete idea." *LinkCo, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 501 (S.D.N.Y. 2002); *see also Schroeder v. Cohen*, No. 652183/2013, 2017 WL 5668423, at *15 (Sup. Ct. N.Y. Nov. 27, 2017). Grace contends that Vertellus has not established the second element by identifying a novel, concrete idea. A novel, concrete idea must amount to more than "a collection of broad concepts." *Schroeder v. Cohen*, 169 A.D.3d 412, 413 (N.Y. Sup. Ct. App. Div. 2019). The idea "need not reflect the 'flash of genius,' but it must show genuine novelty and invention, and not merely clever or useful adaption of existing knowledge." *Educ. Sales Programs, Inc. v. Dreyfus Corp.*, 317 N.Y.S. 2d 840, 844 (N.Y. Sup. Ct. 1970). Mere

"[i]mprovement of standard technique or quality" does not make an idea "novel." *Oasis Music, Inc. v. 900 U.S.A., Inc.*, 614 N.Y.S.2d 878 (N.Y. Sup. Ct. 1994) (explaining "elaboration and renovation" is not the same as "innovation").

Although Grace now contends that the makeup of Vertellus's catalyst was not novel because the use of ZSM-5 catalysts with zinc in pyridine production was generally known, other evidence suggests that the development of the ███████ catalyst was more than a slight improvement or derivation to a widely known process. Indeed, Grace has itself described the ███ ███ catalyst as "unique" and stated that when it was initially developed there was "no competition in the marketplace." ECF 156-23. Here, as in Vertellus's trade secrets claims, ideas about the ███ catalyst cannot form the basis of a misappropriation of ideas claim because the information was already known to Grace. However, as to its zinc-loaded catalyst formulations, factual disputes about whether Grace actually misappropriated Vertellus's idea through its production of variants and its patent disclosures prevent the Court from ruling on this claim at this stage.

### 6. Bad Faith Assertion of Trade Secret Misappropriation Counterclaim

Finally, Grace does not cite a legal basis for its sole counterclaim: bad faith assertion of trade secret misappropriation. *See* ECF 27 (bringing its counterclaim "[u]nder applicable law" but not identifying any particular legal standard); ECF 161 at 43–45 (citing no statute or case law in support of its counterclaim). However, both the DTSA and the Maryland Uniform Trade Secrets Act ("MUTSA") have provisions recognizing that if a misappropriation claim is made in bad faith, a court may award reasonable attorney's fees to the prevailing party. 18 U.S.C. § 1836(b)(3)(D); Md. Code Ann., Com. Law § 11-1204(1). To succeed on its bad faith counterclaim, however, Grace must show by "'clear evidence that the action [was] entirely without color and taken for other improper purposes amounting to bad faith,' meaning that the plaintiff prosecuted the action

59

'vexatiously, wantonly, or for oppressive reasons.'" *C-Tech Corp. v. Aversion Techs.*, No. DKC 11-0983, 2012 WL 3962508, at *9 (D. Md. Sept. 7, 2012) (alteration in original) (quoting *Optic Graphics, Inc. v. Agee*, 87 Md. App. 770, 789 (1991)).  Where a plaintiff has put forth at least "*some* evidence" in support of its claims, a finding of bad faith is generally not warranted.  *Id.*

Here, although Grace will prevail on Vertellus's DTSA and MUTSA claims, there is not clear evidence that Vertellus brought these claims in bad faith.  At least as to the claims based on Vertellus's zinc-loaded catalysts, Grace prevails on the MUTSA claim only due to a failed choice of law argument that the Court recognizes was not "entirely without color."  Similarly, the Court has rejected the DTSA claim based on emerging case law about the effect of pre-enactment conduct.  As to Vertellus's claims based on its ██████ catalyst, Grace argues that Linda Hicks's email, which stated in 2015 that ██████ "is not considered IP" definitively shows that Grace knew its claims could not prevail.  This Court disagrees with Grace that a statement by one Vertellus employee early in its investigation of Grace's conduct establishes clear evidence of bad faith.  Though ultimately unsuccessful in providing sufficient evidence to carry its burden of proof, Vertellus adduced at least *some* evidence to support its claim, and there is no evidence that Vertellus has otherwise prosecuted this lawsuit in a malicious manner or for "oppressive reasons."  In the absence of evidence of bad faith, then summary judgment will be granted for Vertellus on Grace's counterclaim.

### 7.  Grace's Research and Development Costs

Finally, Grace also contends that even if Grace is liable to Vertellus, Vertellus cannot recover Grace's alleged saved costs of development.  This Court agrees.  Under the DTSA and some state uniform trade secret statutes, saved costs of development are an accepted measure of unjust enrichment damages.  *See Brightview Grp., LP v. Teeters*, Civil Case No. SAG-19-2774,

2021 WL 1238501, at *18 (D. Md. Mar. 29, 2021) (citing cases).  However, the New York Court of Appeals has unequivocally held in response to certification of the question from the Second Circuit, that this theory is not permitted under New York common law in misappropriation of trade secret, unfair competition, and unjust enrichment actions.  *E.J. Brooks*, 31 N.Y.3d at 444.  The court reasoned that under New York law, "compensatory damages must return the plaintiff, as nearly as possible, to the position it would have been in had the wrongdoing not occurred—but do no more."  Therefore, the Court finds that Vertellus is not entitled to Grace's alleged saved development costs.

## IV.    CONCLUSION

For the reasons set forth above, the Court will GRANT IN PART and DENY IN PART Grace's motions to exclude testimony of Dr. Colin McAteer, Dr. Enrique Iglesia, and Dr. Patrick Kennedy, ECF 167 through 168, as set forth in this opinion.  Additionally, the Court will DENY Vertellus's motion to exclude testimony of Dr. Wolfgang Hölderich, ECF 171, and GRANT Vertellus's motion to exclude the sensitivity analysis prepared by Dr. Christine Meyer, ECF 173.

Next, the Court will GRANT IN PART and DENY IN PART Grace's motion for summary judgment, ECF 150.  The motion is granted as to all of Vertellus's claims premised on the misuse of information regarding the ███ catalyst.  The motion is also granted as to Count I (DTSA) and Count X (Indiana or Maryland Uniform Trade Secrets Act) in the entirety.  The motion is further granted as to the unavailability of saved development costs damages.  The motion is otherwise denied.  Summary judgment will be entered for Grace on Counts I and X.

Finally, the Court will GRANT IN PART and DENY IN PART Vertellus's cross-motion for summary judgment, ECF 155.  The motion is granted as to liability for Vertellus's claim in Count V (Breach of Contract) that Grace breached the contract through its patent disclosures.  The motion

is also granted as to Grace's counterclaim (Bad Faith Assertion of Trade Secret Misappropriation). The motion is otherwise denied.   Summary judgment will be entered for Vertellus on the counterclaim.  A separate order follows.


Dated:  August 11, 2021                                          _____/s/_____
                                                                                    Stephanie A. Gallagher
                                                                                    United States District Judge